NOTE.—The crime denounced by the law is the seduction of a female of chaste character under promise of marriage. People v. Eckert, 2 N. Y. Cr. 483 ; see section 284 of Pen. Code.

Previous chaste character is presumed. People v. Kane, 14 Abb. 15.

The word "character" as used in this section, means personal virtue, and not reputation. Kenyon v. People, 26 N. Y. 203. The female must be unmarried and chaste in fact when seduced. Id. The accused may, by proof of specific acts of lewdness on the part of the female, and not otherwise, show that she was in fact unchaste. Id.

# Court of Appeals.

May 4, 1897.

## PEOPLE v. HOWARD A. SCOTT.

1. EVIDENCE—HOMICIDE.

Upon the trial of an indictment for homicide, alleged to have been committed with a revolver, the fact that defendant pawned his overcoat in order to raise money to get his revolver back into his possession, only five days before the homicide, bears strongly upon the question of deliberation and premeditation.

2. SAME.

When a husband is charged with the murder of his wife, it is competent to show his relations with a paramour, as it tends to prove the absence of affection for the deceased and to establish a motive for getting rid of her.

**3. SAME—APPEAL.**

Counsel have no right to appeal simply for the purpose of delay, nor unless they think there is some ground for reversal in the judgement; and if there is any reason for appealing, even though feeble and inconclusive, it should be presented to the court for consideration.

APPEAL from a judgment convicting defendant of murder in the first degree and from an order denying a motion for a new trial.

John D. Lindsay, for the People.

VANN, J.—On the 20th of November, 1896, the defendant, a colored man, twenty-nine years of age, was indicted for the murder of his wife, Maggie Scott, a colored woman, twenty-seven years of age, on the 26th of October, 1896, at No. 159 West Thirtieth street, in the city of New York, by shooting her with a revolver. His trial commenced before the court of general sessions on the 11th of January, 1897, on the 18th of that month resulted in a verdict of murder in the first degree.

Both the accused and the deceased were born at Petersburg, Va., and had known each other from childhood. After receiving a common-school education, he was apprenticed to learn the trade of a painter, but before he completed his term of service, and about 11 years before the homicide, he came North and located in the city of New York, where he has since resided. Three or four years later he was married to Maggie Taylor, the deceased. For a time they lived happily together, but after a while he neglected her for the company of other women, ceased to work regularly, lived largely upon her earnings, and on several occasions beat her with his fists, blackened her eyes, and bruised her face. Quarrels were frequent between them on account of his relations with two white women known as "Dutch Annie" and Martha Nelson. On one occasion his wife caught him with Dutch Annie, and after a quarrel, they separated. She went to Petersburg, where she remainded about a month, when she returned, and soon went living with him again. About a year before her death she found him hidden in the rooms of the Nelson woman, and he then said: "Well, now you have caught me, I am going to live with her." She used to beg him to give this woman up, and he frequently

promised to do so, but still continued his relations with her. He was at her rooms very often, ate there and slept there, passed as her husband, and even assumed her name. During the year preceding the homicide he drank to excess, called his wife vile names, beat her, and threatened to take her life. In July, 1896, he threw a water pitcher at her, saying, "I will kill you yet;" but some one caught it, and it failed to hit her. A month or so later he struck her, and both her eyes were blackened, so that for two weeks she wore a veil when she went out. About six weeks before the homicide he said to one of the witnesses, referring to his wife, "Well, I am after having another fight; I just beat her;" and two weeks later he told the same witness that he had beaten her again. On the 2d of September, 1896, she started for the depot in order to go to Petersburg to attend the funeral of a sister who had just died. She was seated in a car on the elevated railroad by the side of another sister, who was going with her, and he said to her, "If you don't come back over here, I will beat hell out of you," On the same occasion he asked her how she expected him to live while she was gone, and she replied, "Howard, how do you expect me to go home and leave money to support you while I am gone?" He said, "Well, you don't care anything about me, and I have a good mind to cut your throat and send you to hell where your other sister is." She was gone 10 days, and on her return he struck her because she had not written to him during her absence. She was an industrious, hard-working laundress, and the evidence raises no suspicion against her character. While she sometimes swore at her husband, during their differences, she does not appear to have ever offered him violence, or to have resisted when he assaulted her. She was below the average height, and was of slight build. The height or size of the defendant does not appear in the record before us, but was, of course, apparent to the jury. On the 21st of September, 1896, she left him for the third time, and went to live with her sister, at No. 159 West Thirtieth street, while he went to live with Martha Nelson. The same day he stored his furniture, but, not having the money to pay the expressman for moving it, he handed his revolver, an ordinary self-acting six-shooter, about 6 inches long and of 32 caliber, to his friend William Green, and requested him to pawn it for the sum of 50 cents. Mr.

Green did so, and handed the money and the pawn ticket to the defendant, who used the money to pay for moving his furniture. On the 21st of October following, which was five days before the homicide, he pawned his overcoat for $2, redeemed the revolver, and bought some cartridges for it. On that day, or the day before, he and the Nelson woman had been turned out of their rooms for nonpayment of rent. Two or three days later a friend asked him to lend him the revolver, but he refused, saying it might get him into trouble. At about the same time he went to the house where his wife resided and asked for her, and her sister answered that she was not in, but was out at work. At this time his hands were full of cartridges, and he appeared nervous and excited. He took the revolver out of his pocket, and began to load it, but soon said, "Never mind, I will fix this some other time." He also said that before many days went over her head his wife would be sorry for everything she had ever done to him. The day before the homicide a friend met him walking towards the house where his wife lived, and as usual said "Hello, Howard;" but he seemed absorbed in thought, and made no reply, although he was perfectly sober, and it was his custom when thus saluted to say "Hello" in return. October 26th, at about 4 o'clock in the afternoon, he was seen by a witness, who was at work across the street, to enter his wife's apartments and about 15 to 20 minutes later the report came that she was dead.

The deceased left her rooms that morning with her sister at about 9 o'clock, and, after doing an errand, went to a magistrate from whom she obtained a summons against the defendant for nonsupport. She went home alone, and about 4 o'clock her sister returned. She found the outer door shut, but not locked, and the rooms full of smoke from gunpowder. The furniture was not disturbed, and there was no sign of a struggle. Maggie Scott lay dead on the floor of the front room, face downward, the body warm and bleeding from four bullet wounds. She had changed her dress since she left home in the morning, but was dressed to go out, with her hat, veil, and cape on. The keys of the room and her pocketbook, containing a little change, were beneath her, and by her side, in four pieces, was the frame in which she kept her marriage certificate, but the certificate itself could

not be found. The summons was found inside of her clothing, where it could not be seen until her dress was unbuttoned, and the defendant does not claim to have ever seen or heard of it. A bullet had entered between the second and third ribs, above the right nipple, and passed through the lung, taken a downward course. Another entered the body on the right side, between the fifth and sixth ribs, and also passed through the lung, but took a course slightly upward. There was a bullet wound three inches deep at the junction of the neck and the right shoulder, with the course downward and towards the middle line of the body. The fourth bullet wound was on the inside of the right forearm, directly over the elbow, and about two inches above it was a small bruised spot about the size of a five-cent piece. There were no other signs of violence on the body. An expert testified that, assuming the line of the bullets to have been parallel to the floor, the position of the body, when the first wound above described was made, must have been stooping over and turned slightly towards the left; when the second was made, still stooping over and turned towards a different position to the left; and when the third was made, stooping lower yet. No inference could be drawn from the fourth wound as to the position of the body when it was inflicted.

The police promptly searched for the defendant, but could not find him until the next day, when he was found at the house of an aunt residing in Brooklyn, locked in a closet upstairs. The door was pried opened with a hatchet, and as he was seized he said. " Use me well and I will make a clean breast of it. " The arresting officer searched him for the revolver, but, not finding it, asked, " What have you done with the revolver ? " and the defendant answerd, " I threw it into the river on my way to Brooklyn." He was then asked. " How many shots did you fire at your wife ? " and he answered. " Three or four, captain, I cannot remember; I was so excited at the time." What was the cause of this shooting ? " said the officer. "It was jealousy," replied the prisoner. He did not claim that the shooting was accidental, either on that occasion or when he was taken to the station house, where, being told that he was charged with killing his wife, he replied, " Yes; I shot her." On his way over from Brooklyn he said to

the officer, "We had a quarrel together, and she threw the frame at me, and it fell on the floor and broke, and I put the certificate in the stove and burned it in the house there." He also asked to be allowed to look at his wife's body before it was buried. His aunt testified that after he arrived at her house he said he had shot his wife. From her house he wrote to Martha Nelson, addressing her as "Dear Martha," and saying that he would let her hear from him later.

The only witness for the defense was the defendant himself, who contradicted but little of the evidence given by the witnesses for the people. He testified that he lived happily with his wife for about a year, and that then she got to be quick-tempered and disagreeable, and they quarreled. She suspected him of going with other women, and would follow and watch him. He had grown cool in his love towards her, on account of the bad treatment he had received from her. Threats were a common thing between them, but he paid no attention to them. He threw the water pitcher at her because she pestered him when he was asleep on the lounge. When they separated the last time, she said: 'You had better put your things in storage, and get yourself a room, because I am not going to live here any more; I am going to live with my sister." He paid no attention, because he thought she was fooling; but on the following Sunday she said the same thing, and he replied: "Very well, then, I will move." She gave no reason for the separation, and they had separated twice before. He did not deny his relations with Dutch Annie or Martha Nelson. He said that he had carried a revolver for nearly four years, because he went among all classes of people and was out late at night. He took the pistol out of pawn October 21st because he had the money to spare that day, and thought he would get it while he could, but he also said that he pawned his over coat in order to raise the money. He denied that he shot his wife but did not deny his threats or ill treatment. His account of the homicide was that some one told him his wife was looking for him, and he went to her room, but found the door locked and went away. Later he came back, knocked on the door, and she opened it. He then continued: "I said, 'Hello, how are you? I heard you were looking for me last night. She said, 'Yes; I was look-

ing for you, and I am going to get square with you before to-morrow night.' I said, ' What's the matter?' She said, 'You will find out.' I said, · ' Oh, well, if you are cross, I will go out and come back after a while,' and started for the door. She rushed and grabbed me, and said, ' You come back here ; I want to see you.' I turned around, and said : ' What do you want? By the way, will you please give me my card for my society. I want to square my dues.' She said, ' You can have your damned old card. We went into the kitchen, she first and I behind. She opened her trunk, and said, ' Here is your card, and take this other damned hard luck old thing too,' handing me the marriage certificate. I ripped it out of the frame, and put it in the stove, and set it afire with a match, kept the pieces of the frame in my hand, started for the door, and said, ' I will see you later,' and threw the frame down on the floor. As I started for the door, she grab-bed me,—grabbed the pistol out of my pocket,—and I grabbed both her hands, and we got to scuffling, and in trying to get the revolver out of her hands it was discharged, I don't know how many times, accidentally. I did not go there intending to do wrong; she fell on the floor, and I came out. I was excited. I did not run. On the bridge I threw the revolver in the river. I never was arrested before." He admitted that he used to quarrel with his wife about Dutch Annie and Martha Nelson, and that he lived with the latter about two years, off and on, passing as Mr. Nelson. On his cross-examination he testified that for about a year he had not loved his wife as he had before, and did not care whether she left him or not; that she got the re-volver out of his hip pocket completely in her hands, and had complete possession of it, when he turned and caught hold of it ; that when she had it by the handle with both hands he caught her by the wrist, and their four hands were together ; that he was trying to get it out of her hands when it went off three or four times, and after the last shot she fell to the floor; that she had hold of the pistol when the last shot was fired, but then her hands opened, she fell, and he had the revolver in his hand ; that she was standing up when her hands loosened from the revolver, and he standing up against her, and had hold of her hands just at the time when she let go; that he could not explain why she caught

hold of the revolver just as he was going out of the room, nor give any reason for her conduct, nor tell why, if she caught the revolver by the handle, the bullet hit her every time, unless in the struggle it had got turned around; that he knew she was wounded, for he saw the blood, but did not give any alarm nor send for help, because he was nervous and frightened; that they swayed backward and forward from four to six times while the revolver was going off, but not a word was spoken during the struggle, which lasted something like three minutes; that when he put the pistol back in his pocket she was lying flat on the floor, and the blood was flowing from her mouth, and, although he felt sorry for her, he did not ask her if she was hurt, say anything to her, or touch her; that he could not tell whether his finger or his wife's pressed the trigger, which had to be pulled twice in order to discharged the revolver; that he had no difficulty with her after she left him, and she never bothered him in any way after that; that when the arresting officer asked him. "What was the cause of the shooting?" he replied, "Jealousy," meaning that she was jealous of him, not that he was jealous of her; that he did not tell the officer that his wife was shot by accident; that he did not see anything of the keys or pocketbook that were found under his wife; and that when he left the scene he did not run, but walked to a barroom, and took a drink of whisky. He repeatedly contradicted himself upon the cross-examination, stating at one time that he was going towards the window, and at another that he had his hand on the knob of the door, when his wife caught hold of the pistol. At one time he testified that he had the revolver in his own hand alone when the last shot was fired, and that she did not then have the revolver in her hand to his knowledge. Afterwards he contradicted this testimony, as well as some other portions of his story.

We think that the evidence warranted the verdict of the jury, and that no other reasonable conclusion was possible. The defendant had become vicious and desperate. He had treated his wife cruelly and had threatened kill her. She had ceased to support him, and he had ceased to love her. Just after he and his mistress had been turned out of their rooms for nonpayment of rent he pawned his overcoat to get his revolver, and at once bought some cartridges to load it. He refused to lend it to a

friend, and when loading it said that before many days his wife would be sorry for everything she had ever done to him.   He was seen to go to her room, and in less than half an hour she was found dead, with four bullet wounds in her body.   The furniture in the room was not disturbed.   She was apparently about to go out when he entered the room, for she had her hat, cape, and veil on.   Her keys and pocket book were found beneath her body, as if she had dropped them when she was shot, and had fallen upon them.   There was nothing in the room to indicate a struggle, or to confirm the defendant's story, except the fragments of the frame that held the certificate, and his statements as to how the frame was broken were contradictory.   His account of the transaction on the stand is improbable, if not impossible.   When arrested, he said that he had shot his wife three or four times, but did not claim that it was accidental.   Within 24 hours after the homicide, on three different occasions and to three different persons, he said that he shot his wife, without making any explanation or claiming that it was accidental.   Right after the homicide he ran away and hid himself.   The location of the wounds, high up on the body of the deceased and all in a small space, the course of the bullets, the fact that all the balls struck her, and that no powder marks were observed upon her hands or clothing, though none were looked for, contradict the theory of accident, and point to deliberate and premeditated design.   The statement that she persisted in trying to take the revolver away from him, without saying a word, while bullet after bullet penetrated her body, is so unreasonable and improbable that the mind involuntarily rejects it as untrue.   The shots impress us as willful, not accidental, and whatever the motive of the defendant may have been, whether he was influenced by hatred because his wife had left him, or revenge because she would no longer support him, or by some other reason not disclosed, is unimportant, for he who does an act willfully necessarily intends that which must be the consequence of his act.

After a careful study of the case upon the merits, we find nothing that should disturbed the verdict, and we will next consider the exceptions taken during the trial.   The record contains 13 exceptions, some of which were taken to rulings of the trial

judge during the examination of proposed jurors, but as no juror sat whose competency was questioned and the defendants peremptory challenges were but little more than half exhausted when the jury box was filled, those exceptions present no question for consideration here. People v. Larubia, 140 N. Y. 87, 35 N. E. 412. The exceptions to the denial of defendant's motion to dismiss the indictment and to the denial of his motion for a new trial require no comment, in view of the statement of facts already made. An exception was taken to the testimony of the witness Green, to the effect the defendant told him to pawn his revolver for 50 cents, and another to the admission of the pawnbroker's evidence that the defendant redeemed the revolver, upon the ground that it was incompetent and immaterial. We think, however, that it was both competent and material to show preparation, and preparation implies deliberation and design. Any fact that has such a relation to the main act at issue as to bear with reasonable probability on the intent with which that act was done is material. The purchase of a weapon with which a homicide is committed shortly before the fact is always received to show that the accused had provided himself with the means of killing. So we think that the pawning of the revolver, and the pawning of his overcoat by the defendant, in order to raise money to get the revolver back in his possession, only five days before the homicide, bear strongly upon the question of deliberation and premeditation. An exception was also taken to the evidence of the defendant's declarations in regard to his relations with Martha Nelson, but, when a husband is charged with murder of his wife, it is competent to show his relations with a paramour, as it tends to prove the absence of affection for the deceased ; and to establish a motive for getting rid of her, as has recently been held by this court. People v. Harris, 136 N. Y. 423, 33 N. E. 65. The defendant, went on the stand as a witness in his own behalf, freely admitted the fact, and it may be said generally that all of the exceptions relating to evidence were taken in regard to testimony subsequently confirmed by the defendant himself. Independent of his admissions, however, his exceptions are so manifestly frivolous that discussion is difficult, for there is nothing to found an argument upon. No exception was taken to the charge of the learned trial

judge, who conducted the trial throughout with great care, and in every instance of doubt ruled in favor of the defendant. The charge was fair and impartial, and laid down with clearness and accuracy the questions that the jury were to decide and the principles of law that governed the case. All the safeguards provided by law for the protection of persons accused of crime were carefully observed. We find no error in the record, and we think that the grave charge against the defendant was fairly, if not conclusively, established by the evidence. The defendant has not been represented by counsel upon this appeal, and no brief has been filed or argument made in his behalf, although he was well defended upon the trial. Of the two counsel who then represented him, and whose names are signed to the notice of appeal, one has since died, but the other, after signing a stipulation setting the appeal down for argument before this court on a day named, did not appear nor furnish any points, and he has given no satisfactory reason, although an opportunity has been offered, for taking the appeal and thus abandoning it. In reply to a letter of the clerk inquiring why no brief had been filed in behalf of the appellant, he wrote as follows: "I will say that I deemed it my duty to have the case reviewed in a higher court, but have submitted no brief, and do not intend to, for the reason that I do not believe it would be of any service to the court in the examination of the record." Counsel have no right to appeal simply for the purpose of delay, nor unless they think there is some ground for a reversal of the judgment; and, if there was any reason for appealing, even if feeble and inconclusive, it should have been presented to the court for consideration. As no one appeared for the defendant on the appeal, we have felt it our duty to act as his counsel ourselves, and to search with diligence and care for anything in the record tending to prejudice him, or in any way to do him injustice, but we can find nothing, whether excepted to or not, that would justify a reversal of the judgment against him. It must therefore be affirmed.

All concur.

Judgment affirmed.