## Court of Appeals.

January 9, 1900.

## PEOPLE v. FERRARO.

1. HOMICIDE—DELIBERATION.

   If there be sufficient deliberation to form a design to take life, and to put that design into execution by destroying life, there is sufficient deliberation to constitute murder, no matter whether the design be formed at the instant of striking the fatal blow, or whether it be contemplated for months.

2. SAME — MOTIVE.

   It is not necessary to look for a motive where the crime is plainly proved.

3. SAME.

   Where the evidence is circumstantial only, the subject of motive is more important, but, when it clearly shows that the fatal act was committed willfully by the defendant, the nature of his motive is unimportant.

4. CRIMINAL LAW — INSANITY.

   A person is not excused from criminal liability on account of insanity, except upon proof that at the time of doing the alleged criminal act he was laboring under such a defect of reason as either not to know the nature and quality of the act he was doing, or not to know that the act was wrong.

5. SAME.

   If capable of distinguishing between right and wrong in the particular act done by him, he is justly liable to be punished as a criminal.

6. SAME.

   If the defendant was laboring under a delusion, there must be a connection between the alleged delusion and the homicide.

7. SAME—QUESTION OF FACT.

   Whether the evidence of the physicians was entitled to greater weight than any other evidence was not a question of law, but a question of fact.

APPEAL from judgment, convicting defendant of murder in the first degree.

Hugo Hirsh, for appellant.

Hiram R. Steele, District Attorney, for the People.

VANN, J.—This appeal is from a judgment convicting the defendant of the crime of murder in the first degree, committed, as alleged, in the borough of Brooklyn on the 4th of September, 1898, by cutting the throat of Luciano Musacchio with a razor. Both the accused and the deceased were natives of Italy, but the former had been in this country for seventeen years, and the latter for twelve or thirteen, prior to the homicide. They were well acquainted, and distantly related, but it does not appear that they had seen much of each other for some time prior to the occasion in question. On the afternoon of Sunday, September 4, 1898, Musacchio and three Italian friends were drinking beer in a little yard at the rear of a building known as "46 Front Street, Brooklyn." After a while the defendant and three of his friends, also Italians, came in, shook hands all around, and drank beer by themselves at another place in the same yard. The eight men were thus occupied for several hours, and the two groups apparently had little to say to each other. It does not appear how much beer was consumed by the defendant and his friends, but during the afternoon the deceased and his friends each drank about a pint, although, according to the evidence, no one of them was apparently under its influence. Shortly after the defendant came in, Blonda, one of the three who were drinking with the deceased, invited him to drink with them, but he answered, "No; we drink by ourselves, and you drink by yourselves." There was some conversation between the defendant and the deceased, but the witnesses differ in stating their recollection of it. Blonda testified that the defendant said to the deceased, "You give me a dollar, and you go all around saying you give me a dollar," and the deceased replied, "I did not say anything about the dollar." The defendant then said, "Whenever I get a dollar, I will give it to you;" and the deceased answered, "I do not

want it." Thereupon the defendant took the deceased, who was much larger than himself, by the hand, and tried to pull him out of the yard; but he got away, and told him to let him go, saying, "An older man than you are, and a relation as you are, I will give you a slap," or "you deserve to be slapped." The defendant answered, ".With reason, slap me ten times," and then turning to Diodati, one of those who were with the deceased, said, "I have always something to say with you." Diodati, in narrating the same conversation, says that the defendant spoke about a letter that he wrote to the deceased from Philadelphia while he was in prison, asking for a loan of five dollars, and said that the deceased had refused to let him have it, saying: "You have two brothers. Why don't they send it to you?" The defendant then took the deceased by the wrist and tried to pull him away. Right afterwards he said to Diodati, "You also talk, Diodati;" and the deceased answered: "That man ain't doing anything. He is attending to his business. Did you come here to raise trouble?" The defendant replied, "You have four eyes, and I have six eyes." On his cross-examination Diodati stated that the defendant threatened him (the witness) and said: "You are in the gang. You take some friends with you, don't you"—and that the deceased said to the defendant that he had better go, or else he would put him out  After this conversation the witnesses agree substantially as to what occurred. Later in the afternoon the deceased and two of his friends (one having left before) started to leave the yard, went up the steps at the rear of the house, and passed through the hall to the front of the building. He was behind his two friends, and the defendant followed him, and when they reached the front steps was close to him. As they were about to descend the steps the defendant drew a razor from an inside pocket of his coat or vest, and, putting his left hand on the shoulder of the deceased, with the razor in his right hand, he cut his throat with a single stroke. Musacchio at once fell, saying, according to the statement of one of the witnesses, "Oh, my God! they killed me;" and of another, "You kill me! What did you do that for?"—and died almost immediately. The defendant struck at him with the razor three times,—once, at

least, after he was down. The ambulance surgeon, who promptly examined the body before it had been moved, found three cuts,— one over the mastoid process, which went down to the bone, but not in the neighborhood of "any vessels or structures sufficient to cause death." The second was a superficial cut on the neck, not at all serious, and the third, on the right side of the throat, severed the carotid artery and internal jugular vein, and in the opinion of the ambulance surgeon, corroborated by that of the coroner's physician, caused death from hemorrhage. The latter also stated that in his opinion these wounds could not have been caused by one stroke. The witness Diodati says the defendant chased him with the razor in one hand shortly after Musacchio fell. Mazzio, who kept the grocery at 46 Front street, did not see the defendant strike the deceased, but saw him standing two or three feet from the body, waving a razor very rapidly; and, as he started to come toward the witness, Mazzio told him not to come near him. Barroni, who sat on the bottom step talking with some boys, said that he heard tramping on the top step, and, looking up, saw "them stepping around, and I got up, and I saw Ferraro have one hand on his shoulder and cut him with the other hand." Very soon the defendant ran down Front street, followed by an excited crowd, some of whom threw stones at him. The arresting officer found him on Dock street, about 300 feet from Front; and in his right hand, which was covered with blood, he held a bloody razor, and would not give it up until compelled to. He was taken before Chief MacKellar at police headquarters, and, according to the recollection of two policemen who were present, the chief asked the defendant, "Why did you kill that man?" and he answered, "Because he is no good." When asked, "What were you arrested the other time for, and what were you in jail the other time for?" he said, in substance, that he worked for a boss in Philadelphia who would not pay him, and he assaulted him, and served four-and-a half years in prison for it. According to the recollection of Chief MacKellar, the defendant, when asked, "What did you do that for?" answered, "I no talk," and was then told that he need not talk if he did not wish to. The chief stated the conversation in relation to

the assault in Philadelphia and the imprisonment therefor the same as the other officers. Other witnesses were sworn for the people, and further details given, but this is the substance of the testimony in chief for the prosecution.

The defense called no witness who gave a different version of the homicide or the circumstances surrounding it, except one who said that he was drinking with the group surrounding the deceased in the rear of 46 Front street, and that there was no trouble or quarrel of any kind in his presence. Several witnesses, who had known the defendant for some time, testified to strange acts and incoherent conversation on his part prior to the homicide. Oranges, who had known him but a month, testified that in January or February, 1898, he asked the defendant, when in jail, why he committed the murder, and the answer was, "They put me in here for a long time, and they won't pay me at all." Referring to the keeper of the prison, who was present, he said, "This man, he got good pay, but they won't pay me." When asked, in substance, why he expected any pay, as he was in jail for murder, he answered: "I didn't commit any murder. I don't know anything about it. Well, I don't know, it is better to me to put me in some fire, or put me out of here." The witness asked him, "What are you going to say on the day of the case?" "Well," he said, "I haven't anything to say. I don't know anything." He was then told, "You will have to plead, and if you plead for manslaughter you may get out." "Oh, no," he replied, "it is better for me to go on fire, or they put me out, and I go for my business." When asked again, "What did you do that murder for?" he said: "Well, there is a towel on the table. You want to say this towel is not on the table. It is your fault. All the witnesses they bring in the court, but I don't know anything about murder." A brother of the defendant testified that in July, 1892, the defendant acted as if he did not know what he was talking about; that he said the company in Philadelphia gave his mother plenty of money while he was in jail, and that he wanted it from her, and told her not to give it to the other brother, but his mother replied, "I haven't any money." This witness, when asked to describe the actions of the defendant,

said, "He was very crazy, saying that Humbert I. (meaning the king of Italy) had sold him to this country." On his way home from Philadelphia, after the expiration of his term in prison, the witness said he had to hold him to keep him from jumping from the train, and the family watched him for awhile to see that he did not run away. Finally they caused his arrest for assaulting his brother, and he was sentenced to imprisonment for ten days. The witness was asked, "Did he talk intelligently to you?" and the answer was, "Sometimes he used to, and other times he used to keep out of the way." He further testified that the condition of defendant's face had changed, and that when he came back from Philadelphia it was "very dark, funny looking. He didn't look as he used to. He had all changed." He also said he did not know that the defendant carried a razor in his pocket, and that he used to be shaved in the barber shops. No further information was given by any one as to the defendant's possession or use of a razor. Another witness, when asked as to the conduct of the defendant for a month or more previous to the homicide, said: "Sometime good; sometime wrong. He used to speak and say a good many things about dead people and about sorcery and witchery, and so on. * * * Sometimes he used to speak for a half an hour or an hour, and so on, and then he used to stop right off and would go away, and that's all." The defendant's mother testified that: "He acted like a crazy man. * * * He used to tell me, 'you come to Philadelphia and get my money, eh? You come to sell one of my buildings in Philadelphia;'" adding that he wanted the money. She also said that he owned no building in Philadelphia, and that "he used to say that he would see his dead people, mentioning all the dead people that belonged to our family." He called her a witch and a whore, and charged that through her witchery she had brought him to prison. One of the counsel for the defense testified that, after the relatives of the defendant had employed him as counsel, he saw him in jail, and speaking in Italian, told him what a serious matter it was. The defendant did not answer any questions, but said that he had no brother, mother, or sister; that he had nothing; that he wanted to go out immediately

and attend to his business; that everybody in that jail was getting paid for what they did there, and he got nothing; that when told an effort would be made to get a plea of manslaughter in the second degree accepted, so that possibly he might not be sentenced to more than ten years' imprisonment, he said, "I either wish to go out of here, or I want to be burned." Later, when the witness spoke to him again about the plea of manslaughter, he said: "I don't know anything. I have my own lawyers." He was then asked, "Who is that?" and he replied, "Antonio Fogo." "Who is he?" "He is dead." "How will you consult him?" "I will call him back." Mr. Conti, an official interpreter, testified that when he asked the defendant a question "he always answered something entirely different." When in jail he said to the witness, "I want my money. I worked for my money, and I want it. These people here work. Me work all day and night, and if I get hold of them I kill every one of them. I want my money. I don't like to work for nothing." The witness spoke to him about pleading to a lighter offense than the crime of murder, and the defendant answered: "I don't care. I have to be set fire or I shall be burned up." In court the witness told him that they were trying him for his life, and he replied, "I don't care what they do."

The defendant himself was sworn, holding up his hand voluntarily for the purpose, and, answering through an interpreter, said that his mother was not living; that he had no brothers; that he did not remember the 4th of September, and did not know what was going on in court. He was asked, "Do you remember having been in prison in Philadelphia?" and he answered in English, "I decline my name, on addition the politician, the grand jury, any time want spell words that they mean in the book over here to give order, I know one get the order let me go people any place have in the country." The court thereupon instructed the interpreter to interpret this to the defendant, and, having done so, he gave his reply as follows: "When the administration used to lick the people in the carriage, keep them under order, and then they must be well taken care, otherwise let them go every one his own way, so

they can go their own way, and when a man is by himself in prison it is better for him to be burned." On his cross-examination, through the interpreter, some of his answers were relevant and sensible, but the most of them were not. No medical expert was called by the defendant.

In rebuttal the prosecution called two experts who had had great experience in the examination of lunacy patients, which had been substantially their entire business for a series of years. Each had examined several thousand cases of alleged insanity. They stated, in substance, that on two occasions some months after the homicide they examined the defendant through an interpreter, and asked him various questions in relation to his birth and history, to all of which he answered, "I don't know." Sometimes he answered in English questions asked through the aid of an interpreter in Italian, and at the last examination all the questions and answers were in English. At that time he apparently understood what was said to him, and some of his answers were intelligent, but others were not These physicians, after applying the medical tests suggested by their experience, swore that the defendant was sane when they examined him, and that from the evidence on the trial, all of which they had heard, they were of the opinion that he was sane at the date of the homicide. When asked on cross-examination if certain words and acts of the defendant were those of a sane man, they answered, "No." While they did not say so in terms, they intimated that the defendant was shamming.

We have thus given an outline of the evidence, necessarily omitting many details; and the first question we are asked to decide is whether there was enough evidence of deliberation and premeditation, which are essential elements in the crime of murder in the first degree, to warrant the conclusion of the jury. Upon this subject the trial court charged as follows: "It is not enough, in order to find a man guilty of murder in the first degree, that you find he killed another with a design to kill him. It must be from deliberate, premeditated design, and, while there must be time to deliberate and premeditate, there is no arbitrary limit placed upon that time. Deliberation

and premeditation may be a matter of years, it may be a mat-ter of months, it may be a matter of days, it may be a matter minutes, it may be a matter of seconds, but there must be time enough for the man to reflect and to choose. The alternative must be presented to his mind; the choice must be made by him: 'Shall I kill or not? I decide to kill.' * * * If this man had that alternative presented to his mind, if he re-flected and decided to kill the deceased, then he is guilty of murder in the first degree, if he is accountable at all." To this no exception was taken, but at the close of the charge the court was requested to withdraw from the consideration of the jury the question of murder in the first degree; and the trial judge declined, saying that he left it to the jury to determine, and an exception was taken by the defendant. In this case the time for reflection may have been very short, but, according to the evidence, it was not necessarily so. We cannot look into de-fendant's mind and see when he formed the intention to kill. A short time before the act of killing unfriendly words had passed between him and the deceased. When Musacchio left the yard the defendant followed him out, and without uttering a word, drew a razor from an inside pocket of his coat or vest, opened it, put his left hand on the shoulder of the deceased, and with the razor in his right hand inflicted the fatal wound, which he followed up by two more, neither of which, however, were of a serious character. The defendant's intention must be inferred from his acts, and it was a fair inference that he drew his razor for the purpose of killing the deceased. Why he carried a razor does not appear. The nature of the weapon, the manner of its use, and the place where the blow was struck, are facts of the highest importance. The jury might properly have found that the thought of taking life was conceived, and the intention to kill formed, not later than when he put his hand in his pocket. The interval between that act and the in-fliction of the fatal wound, though very short, was sufficient for reflection, which implies deliberation. There was no apparent cause for excitement or anger, nor anything to prevent cool re-flection. Not an act had been done, nor a word spoken, by either of the parties with reference to the other, for some min-

utes, probably not for an hour, before the fatal stroke. There was nothing to indicate hot blood or unreflecting action. If there had been provocation, there was time to cool off. Hence the jury could further find that, after the formation of a settled purpose to kill, there was time for second thought and a change of purpose before the act of killing. The design was not formed and executed at the same time, as there was an interval between, short but appreciable, and "sufficient for some reflection and consideration upon the matter, for choice to kill or not to kill, and for the formation of a definite purpose to kill." People v. Majone, 91 N. Y. 212. As was said in People v. Clark, 7 id. 394: "If there be sufficient deliberation to form a design to take life, and to put that design into execution by destroying life, there is sufficient deliberation to constitute murder, no matter whether the design be formed at the instant of striking the fatal blow, or whether it be contemplated for months. It is enough that the intention precedes the act, although that follows instantly." This declaration of the law was indorsed in People v. Conroy, 97 N. Y. 62, 76, as well as the following laid down in Leighton v. People, 88 N. Y. 117: "If the killing is not the instant effect of impulse, if there is hesitation or doubt to be overcome, a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder." In People v. Hawkins, 109 N. Y. 408, 411, 17 N. E. 373, the trial court, referring to the subject of deliberation, in its charge said to the jury: "When you come to define the word, all that the law requires is this: that there should be some reflection and some thought that precedes the blow. If there is thought, if there is reflection on the act, and if there is a choice and a determination as the result of those mental actions, then there is sufficient deliberation within the law." The charge was indorsed as accurate, and the judgment of conviction affirmed. See, also, People v. Johnson, 139 N. Y. 358, 34 N. E. 920; People v. Constantino, 153 N. Y. 24, 47 N. E. 37; People v. Decker, 157 N. Y. 186, 194, 51 N. E. 1018; People v. Kennedy, 159 N. Y. 346, 352, 54 N. E. 51. The absence of a sufficient motive, which is urged upon us in

this connection, while always significant, is not conclusive; for, as we have recently said, " the motives which prompt the mind to the commission of crime are frequently obscure, often trivial, and never adequate." People v. Sutherland, 154 N. Y. 345, 353, 48 N. E. 520. So, in People v. Johnson, 139 N. Y. 358, 361, 34 N. E. 921, the court said : "There does not seem to have been any particular motive prompting the defendant to kill Peck. * * * But it is not necessary to look for a motive where the crime is plainly proved." Where the evidence is circumstantial only, the subject of motive is more important, but, when it clearly shows that the fatal act was committed willfully by the defendant, the nature of his motive is unimportant. People v. Feigenbaum, 148 N. Y. 636, 639, 43 N. E. 78 ; People v. Scott, 153 N. Y. 40, 46 N. E. 1028. We think that the question of deliberation and premeditation was properly submitted to the jury, and that their verdict is conclusive on that point.

We are also asked to reverse the judgment because the verdict was contrary to the weight of evidence upon the question of insanity, and we have given the subject the careful attention that its importance demands. There was evidence which, if believed by the jury, would have warranted them in finding the defendant not guilty upon the ground of insanity. So far as his conduct prior to the homicide was disclosed, it was mainly through witnesses nearly related to him, and interested in his defense. It was for the jury, not for us, to decide whether they spoke the truth. The most important evidence bearing upon this branch of the case related to the conduct of the defendant right after the homicide, as well as while he was in jail, and during the trial. After he had reflected upon the consequences of his act, there was a strong motive for feigning insanity, and experience shows that the practice of such deception is not infrequent in criminal cases of grave character. The answers of the defendant when on the witness stand indicate that he was either insane or shamming. His answers at police headquarters immediately after the homicide were pertinent and rational. Whether he was shamming or not could best be told by the jurors who saw him as the trial went on, and looked in his face when he gave

his strange and incoherent testimony. They clearly thought he was shamming, and it would be hazardous for seven judges of the law, who never saw him and have no means of judging ex·cept from the printed record, to say that the twelve judges of the fact were wrong. If he was trying to deceive then, there is a strong probability that he was trying to deceive while confined in jail awaiting trial. It is impossible for us to say, and the nearest approach to justice that can be made is to leave such questions to the jury. The medical experts were apparently skillful and disinterested, and their long experience rendered their opinions valuable. A person is not excused from criminal liability on account of insanity, except upon proof that at the time of doing the alleged criminal act he was laboring under such a defect of reason as either not to know the nature and quality of the act he was doing, or not know that the act was wrong. Pen. Code, § 21. As we have recently said, "it is not every weak or disordered mind that is excused from the consequences of crime." People v. Burgess, 153 N. Y. 561, 47 N. E. 889. Mr. Wharton says: "Partial insanity is no defense when the crime was not its immediate product. If the defendant was sane as to the crime, but insane on other topics, the insanity in the latter respect will not save him. The crime must have been the result of a delusion." 1 Whart Cr. Law, § 41. "The insanity must be such as to deprive the party charged with crime of the use of reason in regard to the act done. He may be deranged on other subjects, but, if capable of distinguishing between right and wrong in the particular act done by him, he is justly liable to be punished as a criminal." Freeman v. People, 4 Denio, 8, 29. If the defendant was laboring under a delusion relating to property rights in Philadelphia, or the action and character of his mother, or was a believer in witchcraft or sorcery, there is nothing to connect these delusions with the taking of Musacchio's life. No evidence was given of any delusion with reference to the deceased, or anything directly or indirectly connected with him. There is nothing to indicate that the defendant believed some fact, not true in itself, but which, if it were true, would excuse his act. People v. Taylor, 138 N. Y. 398, 407, 34 N. E. 275. There was

no connection between the alleged delusions and the homicide. The evidence tended to show that the defendant knew the nature and quality of the act he was doing; that he was conscious he was striking at the life of a human being, and knew what the effect of the blow would be.    There was no evidence of epilepsy, hereditary tendency, cerebral peculiarities, or injury to the head.    None of the usual physiological symptoms of insanity were shown to exist, unless "the dark and funny look" of his face, said to have been observed by one witness, but by none of the others, may be of that character.    When asked by the chief of police, within a few minutes after the fact, why he killed this man, if he answered, "Because he is no good," as two observers testified, the answer indicated that he knew what he had done, as he gave a reason for it.    If the answer was, "Me no talk," as the third observer stated, it indicated that he was thoroughly on his guard, and able to protect himself from the danger of an entangling admission.    The legal presumption, in the absence of negative evidence upon the subject, is that he knew the act was wrong; and there was no evidence to show that he did not know it was wrong, except such as tended to show that he did not know anything.    As this was more marked while he was a witness on the stand than at any other time, the jury was in a situation to judge intelligently about it; and their conclusion, after observing him for days, that he was trying to deceive, we are in no position to review.    There, is nothing to show that the verdict was influenced by mistake, error, or prejudice, and we are unable to say that it was against the weight of evidence.

Only one other question requires the expression of consideration.    The trial court was asked to charge that "the evidence of the physicians in this case is not entitled to any greater weight than any other evidence, and the jury has a right to disregard such evidence entirely."    The court declined to so charge, saying:    "The evidence of the physicians and all the other testimony is entirely for you, and the court will not say, as matter of law, that they are not entitled to any greater weight.    You may find that it is entitled to no greater weight than any other evidence, or you may find that it is of greater

weight. It is a question of fact for you to determine, and the jury has a right to disregard such evidence entirely, and you have a right to regard it." The defendant excepted generally, and now urges that the refusal was reversible error. The weighing of evidence is for the jury, and it is for them to determine whether the testimony of one witness or class of witnesses weighs more than any other evidence in the case. It is not for the court to characterize evidence or pass upon its persuasive force. It is the duty of the court to lay down the law to the jury, and whether the evidence of the physicians was entitled to greater weight than any other evidence was not a question of law, but a question of fact. The court properly left the subject to the jury, with the instruction that it was a question of fact for them to determine, at the same time telling them that it was their right to disregard such evidence entirely, or to regard it. We find no error in the record which requires a reversal, and we are of the opinion that the verdict was not against the weight of evidence. It follows that the judgment should be affirmed.

All concur, except MARTIN, J,, dissenting, and HAIGHT, J., absent. Judgment affirmed.

## NOTE ON INSANITY.

The law presumes everyone to be sane and responsible for his acts until the contrary is shown by the evidence. People v. Barberi, 12 N. Y. Cr. 89.

When insanity is set up as a defense to an alleged criminal act, and the defendant offers evidence tending to prove he was insane at the time of the homicide, the legal presumption of sanity is rebutted, and the prosecution must prove sanity by a preponderance of evidence. Id.

If defendant's evidence creates a reasonable doubt as to her sanity at the time of the killing, the prosecution must remove that doubt by a preponderance of evidence. Id.

In order to convict the defendant of murder in the first degree where the defense of insanity is interposed, the question to be determined is, whether the defendant, by the testimony in the case, has met the requirements of the statute and satisfactorily shown that, at the time of the commission of the alleged crimi-