**Session J. BOYD, Jr., Defendant below, Appellant,**

**v.**

**STATE of Delaware, Plaintiff below, Appellee.**

Supreme Court of Delaware.

Submitted April 12, 1978.
Decided May 23, 1978.

Robert Halbrook of Wilson, Halbrook, Bayard & Bunting and Thomas J. Stumpf, Georgetown, for defendant below, appellant.

Merritt Burke, III, Deputy Atty. Gen., Georgetown, for plaintiff below, appellee.

Before HERRMANN, C. J., DUFFY and McNEILLY, JJ.

McNEILLY, Justice (for the majority):

Defendant, Session J. Boyd, Jr., appeals his conviction of murder and conspiracy, both in the first degree, assigning as error the Trial Judge's instructions to the jury on the defense of extreme emotional distress, failure to instruct the jury on the law of suicide and certain *voir dire* questions, failure to advise counsel before answering a note directed to the Court by the deliberating jury, and admission into evidence of two black and white photographs of the victim's head. Finding no error in the Court's instructions or failure to instruct the jury and no merit to the other contentions, we affirm.

I

The defendant, Session J. Boyd, Jr., a black man, was married to Candace K. Boyd, a white woman, on March 17, 1976. They were married in Rehoboth Beach and lived in that area until September 28, 1976

when defendant was charged with the murder of Teresa Ann Palmateer, a white woman. Defendant and his wife lived together happily until she took a trip to Georgia in early May 1976. She was gone for approximately six weeks and returned June 18, 1976. During the time his wife was in Georgia the defendant met Teresa Ann Palmateer, the victim, and had a sexual affair with her. The affair ended when Mrs. Boyd returned from Georgia.

Mrs. Boyd found out about the affair after becoming a friend of Miss Palmateer and going with her a number of times to various places and bars in and around the Oak Orchard-Lewes-Rehoboth Beach area. Around the middle of August, the defendant's marriage became increasingly troubled because of gossip and rumors circulated by Miss Palmateer for the purpose of breaking up defendant's marriage, including accusations that: Mrs. Boyd was a "truck stop girl"; Mrs. Boyd would go with anybody; Mrs. Boyd was using defendant for what she could get out of him; defendant's wife was a "hooker"; defendant was cheating on his wife; his wife had "messed up" on him; and his wife wanted to leave him and move in with another black man.

The defendant began drinking heavily around the middle of August because of the marital tension and pressure resulting from the gossip and rumors initiated by Miss Palmateer. Defendant and his wife would argue about the rumors and what could be done to squelch them. Just prior to September 25, 1976, defendant's wife had to be taken to the hospital because she was hemorrhaging. The doctor told defendant that his wife was pregnant and might lose her child. Defendant blamed Miss Palmateer for his wife's tension and upset condition and her pregnancy problems.

On the day of the homicide, September 25, 1976, defendant began drinking beer as soon as he got up in the morning. He worked in the Rehoboth Beach apartment where they were living doing repairs and remodeling, and during the course of the day and up until about 10:30 p. m. he consumed approximately two six-packs of beer and a pint of rum. He also took some tranquilizers, two of them when he first got up in the morning and two more about 7 o'clock at night. About 10:30 p. m. defendant and his wife went to a bar in Lewes looking for Miss Palmateer because she owed him some money and defendant also wanted to talk with her about how she was wrecking his marriage with her rumors and gossip.

Defendant went alone into the bar, and there he saw Miss Palmateer. He asked her about the money she owed him, and told her about the things she was doing to hurt him and his wife. After a few minutes Miss Palmateer and defendant left the bar and went to defendant's car where Mrs. Boyd was waiting. Miss Palmateer voluntarily got in the car with defendant and his wife. They talked for a while, and after a few minutes they drove away. Defendant stopped at a liquor store near Lewes, got two beers and then drove to defendant's mother's house where they parked, and talked for about 15 minutes.

Defendant and Miss Palmateer got out and went around to the rear of the car to continue talking alone. Defendant told Miss Palmateer "You just make me so mad I just feel like killing you. I ain't got nothing left if I lose my wife. I ain't got nothing." Miss Palmateer admitting doing everything and said that she couldn't really blame the defendant for wanting to kill her and wouldn't blame him if he did. She also told the defendant, "you know I always said that I would never make it to my twentieth birthday."

Miss Palmateer then asked defendant, "Will you do me a favor? When you do it, will you leave my body at my mother's house?" Defendant told Miss Palmateer that if he left her body at her mother's house that would help him get caught. She agreed and asked "Can you leave my body close to my mother's house?" Defendant said he would do that. They then talked about the place of the killing and they agreed it would be done about a mile or a mile and a half from her mother's house.

They got back into the car and drove back to the bar in Lewes. At the bar the defendant walked in and asked for Teresa Palmateer, the purpose being to create the impression that he was not with Miss Palmateer at the time and, therefore, no one would suspect that he was involved in killing her. Miss Palmateer cooperated in setting up the alibi by ducking down in the back seat of the car.

They left the bar with Miss Palmateer in the back seat, defendant's wife in the front seat with defendant driving, and headed towards Oak Orchard. At approximately 11:30 p. m. defendant stopped the car on County Road 304 near a wooded area called "Maryland Camp". Before leaving the car defendant took a knife which had been left in the car for the purpose of taking it to his mother's house to have it sharpened. As they were walking through the woods Miss Palmateer stumbled and the defendant grabbed her so she would not fall to the ground. They walked until they came to a clear spot and stood there for a minute and talked. They had previously discussed an alibi of rape, and defendant told Miss Palmateer that if this was going to look like rape she should take her clothes off as she had originally suggested. Miss Palmateer did take off her clothes, folded them and put them in a neat pile. Defendant remarked to her that it was funny that she was folding her clothes but she replied that she did not want to mess them up because they were her mother's clothes. He reminded her that she had told him to throw her clothes away and she said yes that she wanted the clothes thrown away and she guessed that it really didn't matter now.

After the clothes were folded, defendant told her "I just can't stab you like that. You know you've done a lot to me but I just can't stab you like that." Finally defendant went around behind her, took the knife out of his pocket and stuck the handle in the dirt with the blade pointing up. The defendant then told her: "O.K. the knife is down there in the ground. All you got to do now is grab a hold of me and lean back if you really want to do this." She put her arms around the defendant's neck and

started to lean back; the defendant held her with one hand on each side of her waist. The defendant told her that all she had to do was let go and she did, and fell back on the knife. She gave out a groan, rolled over on her right side and told the defendant "Pull it out. It hurts. It hurts."

Defendant pulled the knife out and got down on his knees. She said "You got to finish. You got to finish." She said "You know I am going to scream and I don't want to scream. Put your hand over my mouth and hold it there." With the knife in his left hand the defendant moved it towards her body, and about that time she grabbed his hand and arm with both of her hands, and in the words of defendant she "just kind of pulled it up on—I thought she pulled it right around her stomach and I put my hand over her mouth and she started to say something and I lifted my hand up and she said, "Please finish it, it hurts. It hurts." The defendant recalls, "So she had her hand on top of both my arms. I don't really know if she helped me push it down, if I pushed it down or what, but I do recollect I pulled it out fast. And she grabbed her stomach and kind of doubled up."

Miss Palmateer then yelled out again "It hurts. It hurts. You got to finish it. You got to finish it." The defendant told her that he could not look at her and still finish it and asked her to turn over on her stomach. With her help defendant finally was able to roll her over on her stomach. The defendant then stooped down and put the knife in her back. The defendant picked up the clothes and the knife and left the woods, and as he and his wife drove back to their apartment the defendant threw the knife into the woods and the clothes in a roadside trash barrel.

On Tuesday, September 28, 1976, the police arrested defendant at the construction site where he was working. Defendant orally confessed and then signed a written confession admitting the stated facts which are not disputed.

## II

Defendant claims the victim, who, having had sexual relations with him, sought to destroy his marriage by spreading gossip and stories about him and his wife and tried to entice his wife to leave him. He claims the pressure applied over several months by the victim for the purpose of destroying his marriage drove him to the breaking point, because to him, his marriage was everything.

Dr. Voegele, a psychiatrist who appeared on behalf of defendant, testified that defendant was acting under the influence of extreme emotional disturbance:

Q. Doctor Voegel, from your examination of the defendant and your observation of the defendant and from your experience and training, do you have a professional opinion based upon a reasonable psychiatric certainty as to whether the defendant was acting under the influence of extreme emotional distress or disturbance at the time he stabbed the victim?

A. I do think he was under extreme emotional distress.

Q. Do you wish to explain that in any way?

A. First, the personality. As I explained, the unconscious and repressed hostility towards woman, it is the other side of his big need to be around women. Like as in any love, there is hate and with passive people there is more love on the surface than hate and this came out. He was predisposed to his personality at times to overreact with repressed hostility.

Second, he believed that this Teresa was out to destroy his marriage and again I think he was very dependent on his wife. Again, a passive problem. Like you take a little boy away from his mother. Unconsciously he felt like that. He felt frightened and then undoubtedly he felt guilty for his own transgression with Teresa.

Then the alcohol had something to do with it, too. Although he said he was not completely drunk and also the fact that, as he told it, that Teresa asked him to kill herself. Anybody who is asked to kill somebody, unless he is completely callous, would get some serious emotional problems or distress. That would be my explanation for I believe he was under distress.

The main thrust of defendant's allegations of error is directed to the Trial Judge's jury instructions on extreme emotional disturbance as a mitigating circumstance reducing the crime of murder in the first degree to manslaughter. Defendant's contentions are threefold: i. e., that the Trial Judge incorrectly defined "extreme emotional disturbance" in terms of the former common law defense of provocation, incorrectly instructed the jury that extreme emotional disturbance is the antithesis of the intention to kill, and incorrectly instructed the jury on the standard to be applied to the issue of whether the defendant was acting under the influence of extreme emotional disturbance.

In support defendant recites the following portions of the instructions:

"The words 'extreme emotional disturbance or distress' mean that the defendant's psychic or physical feelings were thrown into such disorder as exceeding the ordinary usual or expected. That is, such exceptional excitement or disturbance as to produce a frenzy of mind which makes one deaf to the voice of reason and there must have been a reasonable explanation for the existence of the extreme emotional disturbance or distress in determining whether such a reasonable explanation exists.

You should consider whether a reasonable person in the defendant's position or situation under the circumstances as he believed them to be, would have suffered from extreme emotional disturbance or distress.

\*　　\*　　\*　　\*　　\*　　\*

Reading the statutes of the Code, one can perceive that the presence of extreme emotional distress or disturbance, as it has been defined, is in a way the antithe-

sis of the intention to kill. When some credible evidence bordering the presence of extreme emotional disturbance has been presented the state must then prove beyond a reasonable doubt that the defendant intentionally caused the death of the victim and also the absence of extreme emotional disturbance before there can be a verdict of guilty of murder in the first degree."

■ Defendant argues that the definition of "extreme emotional disturbance or distress" in the instructions is nothing more than a restatement of the former common law defense of provocation rather than a proper statement of the new concept of "extreme emotional disturbance", a substitute for the common law defense of provocation. Standing alone the "frenzy of mind" language is supportive of defendant's position. Controlling, however, is the additional "reasonable explanation" language which provides the necessary factor to distinguish the instructions as given from the common law defense of provocation.

The *Delaware Criminal Code* does not include a definition of "extreme emotional distress". As stated in the commentary on # 641:

This Code does not include a definition of "extreme emotional distress", believing that any definition would curtail the usefulness of the concept, and that it is a term having a commonly accepted meaning which the jury will understand.

The Commentary on § 632(3) explains why the old law of provocation is inadequate to cover all of the situations in which murder might be reduced to manslaughter:

Subsection (3) is a substitute for the old law of "provocation." That term is inadequate to cover all of the situations in which murder might be reduced to manslaughter because on the defendant's emotional frenzy at the time. Fear, as well as anger, might be a mitigation. For a further discussion of the new term, "extreme emotional disturbance," see Commentary on § 641, where it is called "extreme emotional distress." It is antic-

ipated that defendants will normally in this situation be charged with murder and will be permitted to prove in mitigation that they acted under extreme emotional disturbance. The State will not be able to make out a case of murder if extreme emotional disturbance is an element of defendant's conduct.

If a definition is to be included in the jury instructions, defendant suggests as more appropriate the explanation of "extreme emotional disturbance", as it relates to "intent" and how it differs from the traditional "heat of passion" or provocation defense, appearing in the words of Judge Jasen speaking for the majority of the New York Court of Appeals in *People v. Patterson,* 39 N.Y.2d 288, 383 N.Y.S.2d 573, 582, 347 N.E.2d 898, 907 (1976) (affirmed *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)):

In New York, the prosecution is at all times required to prove, beyond a reasonable doubt, the facts bearing the defendant's intent. That the defendant acted because of an extreme emotional disturbance does not negate intent. The influence of an extreme emotional disturbance explains the defendant's intentional action, but does not make the action any less intentional. The purpose of the extreme emotional disturbance defense is to permit the defendant to show that his actions were caused by a mental infirmity not arising to the level of insanity, and that he is less culpable for having committed them. (See Wechsler, Codification of Criminal Law in the United States: The Model Penal Code, 68 Col.L.Rec. 1425, 1446.) The opportunity opened for mitigation differs significantly from the traditional heat of passion defense. Traditionally, an action taken under the heat of passion meant that the defendant had been provoked to the point that his "hot blood" prevented him from reflecting upon his actions. (See e. g., *People v. Ferraro,* 161 N.Y. 365, 375, 55 N.E. 931, 935.) Furthermore, the action had to be immediate, for if there was time for "cooling off", there could be no heat of

passion. (See, e. g., *People v. Fiorentino*, 197 N.Y. 560, 563, 91 N.E. 195, 196.) An action influenced by an extreme emotional disturbance is not one that is necessarily so spontaneously undertaken. Rather, it may be that a significant mental trauma has affected a defendant's mind for a substantial period of time, simmering in the unknowing subconscious and then inexplicably coming to the fore. The differences between the present New York statute and its predecessor and its ancient Maine analogue can be explained by the tremendous advances made in psychology since 1881 and a willingness on the part of the courts, legislators, and the public to reduce the level of responsibility imposed on those whose capacity has been diminished by mental trauma. It is consistent with modern criminological thought to reduce the defendant's criminal liability upon proof of mitigating circumstances which render his conduct less blameworthy. So long as the prosecution must prove, beyond a reasonable doubt, that the defendant intended to kill his victim, it is not a violation of due process to permit the defendant to establish he formulated his intent while "under the influence of extreme emotional disturbance."

Defendant argues that the definition of "extreme emotional disturbance," as given was error and the phrase should have been explained to the jury in the broad terms as described in the *Patterson* opinion. We agree with the concept as elicited in *Patterson,* but find no error in the definition as given.

■ Turning to the objection to the use of "the antithesis of the intention to kill" and the "reasonable person" language, we also find no error. In instructing the jury that "the presence of extreme emotional distress or disturbance, . . . is in a way the antithesis of the intention to kill", the Trial Judge might have made a better choice of words, but the language following that to which defendant objects properly stated the controlling law as being:

"When some credible evidence bordering the presence of extreme emotional disturbance has been presented the State must then prove beyond a reasonable doubt that the defendant intentionally caused the death of the victim and also the absence of extreme emotional disturbance before there can be a verdict of guilty of murder in the first degree."

■ The defendant further contends the jury was compelled to think that only a reasonable man is entitled to the defense of extreme emotional disturbance or distress when instructed:

"You should consider whether a reasonable person in the defendant's position or situation, under the circumstances as he believed them to be, would have suffered from extreme emotional disturbance or distress."

Taken out of context this language is supportive of defendant's argument, but read in their entirety, the instructions are correct. The controlling language, as previously stated, is found in the paragraph of the instructions preceding the paragraph which defendant has isolated from the body of the text. There must be a *reasonable explanation* for the existence of the extreme emotional disturbance or distress. It is not the person who must be reasonable at the time because a reasonable man would not intentionally kill another person; it is the frenzy of mind based upon a reasonable explanation which is basic to the jury's determination.

The instruction complained of was taken from the text of 11 *Del.C.* § 641, declared unconstitutional on due process grounds because the burden of proving the mitigating circumstances was placed upon the defendant. *Fuentes v. State*, Del.Supr., 349 A.2d 1 (1975).* Although § 641 was not a viable statute at the time of this incident, the concept of "extreme emotional disturbance or distress" prevailed as a mitigating circumstance in homicide cases. We approve

---

* *Fuentes* was overruled by opinion of this Court replying to questions certified to the Court in

the case of *State v. Moyer*, Del.Supr., 387 A.2d 194 (1978), but given prospective effect only.

the "reasonable explanation" concept which the jury must apply, under the instructions as given, in determining whether the circumstances of an intentional killing justify mitigating the resulting crime from murder to manslaughter.

### III

 During the course of deliberations the jury forelady sent a note to the Trial Judge requesting:

"May we as jury members see a transcript of all the testimony?"

The Court was in recess at the time and without recalling counsel from lunch to notify them of the note and its contents, the Trial Judge replied:

"No transcript has been prepared."

Defendant argues that because the Trial Judge failed to advise counsel of receipt of the note, failed to give counsel an opportunity to be heard, failed to inquire of the jury in an effort to clarify the ambiguous language of the note, and failed to inquire of the jury in open court with counsel present, he was denied his right to trial by jury guaranteed him by the Sixth Amendment of the United States Constitution, and Article 1, § 7 of the Delaware Constitution.

We find no merit in this argument. Counsel was advised of the note before the Court convened after the recess; counsel were informed of the contents of the note and made no application; there was in fact no transcript of any of the proceedings at that time since it was not a case in which daily copy was being made; and we find no abuse of discretion on the part of the Trial Judge.

### IV

 Defendant further contends the Trial Judge committed error by admitting into evidence two black and white photographs of the victim's face showing a puncture wound and a black eye, by failing to instruct the jury on the law of suicide, and by failing to question the jury on *voir dire* with respect to a list of thirty questions submitted by defense counsel related to possible prejudice arising from the racial overtones of mixed marriages. These were

matters of discretion and a review of the record reveals no abuse of the Trial Judge's discretion.

Affirmed.

DUFFY, Justice (concurring):

I am satisfied that there was not any reversible error in the Superior Court proceeding and I join in the judgment affirming the conviction and the sentence.