Frank L. ROSS, Defendant-Appellant,

v.

STATE of Delaware, Plaintiff-Appellee.

Supreme Court of Delaware.

Submitted: April 25, 1983.

Decided: Sept. 11, 1984.

Brian J. Bartley (argued), Asst. Public Defender, Wilmington, for defendant-appellant.

John A. Parkins, Jr. (argued), Chief of Appeals Div., Wilmington; Gary A. Myers (argued), Deputy Atty. Gen., Georgetown; James B. Ropp, Deputy Atty. Gen., Wilmington; James E. Liguori, former Deputy Atty. Gen., Dover, for plaintiff-appellee.

Before McNEILLY, HORSEY and CHRISTIE, JJ.

HORSEY, Justice:

Defendant, Frank L. Ross, seeks reversal of his convictions in a jury trial of Murder in the First Degree (11 *Del.C.* § 636(a)(1)), Conspiracy in the First Degree (11 *Del.C.* § 513(2)), and Possession of a Deadly Weapon during the Commission of a Felony (11 *Del.C.* § 1447(a)) in the death of William A. McBride, Jr. In a separate punishment hearing under 11 *Del.C.* § 4209, the same jury declined to impose the death penalty upon defendant. As a result, defendant received a mandatory sentence of life imprisonment without benefit of probation or parole. For the convictions of the weapons offense and conspiracy, defendant was sentenced to consecutive terms of five years and three years respectively.

On appeal, defendant asserts fifteen grounds for reversal. The issues raised involve essentially six subjects: (1) juror exclusion; (2) sidebar conferences; (3) evidentiary rulings; (4) jury instructions; (5) prosecutorial conduct; and (6) double jeopardy in sentencing. We find no reversible error and therefore affirm.

\* \* \*

The evidence at trial may be summarized as follows: On April 14, 1980, William A. McBride, Jr. was stabbed to death in his apartment near Dover. His naked body was found floating face down in a bathtub half-filled with water. He had been stabbed 27 times—10 times in the face and 17 times in the body. There was evidence of a violent bloody struggle but no evidence of robbery or of a forced entry. McBride was killed by defendant Ross at the instigation of McBride's estranged wife. Ross admitted both his participation in the conspiracy to murder McBride and that he killed McBride. The focus of the trial was not on "who" but "why." Defendant contended that he was suffering from mental illness or a mental defect and otherwise acted under extreme emotional distress.

At time of death, McBride, 45 years old, had been separated from his wife, Judith A. McBride,[1] for three months; and his

1. Judith A. McBride was also indicted for First Degree Murder in the death of her husband. She was separately tried and found guilty as charged; and this Court has affirmed her con-

wife had filed for divorce. The parties had been married only two years. Each had prior marriages and children by them. The parties had one child, a handicapped boy suffering from cerebral palsy.

Ross, 23 years old, recently discharged from the Navy, had come to Dover in search of work. He came at the urging of Robert Kreider, age 37 and an acquaintance of Judith McBride. Shortly after arriving in Dover in January, 1980, Ross and Kreider moved in with Judith McBride after Kreider's trailer home became uninhabitable.

The first day that Ross met Judith McBride, she told him that she wanted her husband dead. From McBride, Ross heard lurid tales charging William McBride with wife-beating and sexual abuse as well as cruel and inhuman treatment of their handicapped child. She asked Ross if he would be willing to kill her husband; and Ross answered, "Yes."

McBride had previously asked Kreider to help her kill her husband; but Kreider had been noncommital. The previous summer McBride had made two abortive attempts to secure a hired killer. More recently, McBride and June Davis, McBride's third roomer, had attempted without success to do away with William McBride. The plan had involved Judith McBride's putting Valium and sleeping pills in her husband's food; waiting for him to become unconscious and then placing him in a filled bathtub to drown under circumstances that would appear to be an accident. The effort was made but the plan backfired.

Within a week or so of their meeting, McBride promised to give Ross half of her husband's $20,000 life insurance policy if Ross would kill her husband. Over the next three months, McBride and her roomers, primarily Ross and Kreider, discussed six or seven different schemes for killing William McBride under circumstances that would suggest either an accidental death or death by an unknown assailant.

Thereafter, and before April 14, 1980, two aborted attempts were made by Ross and McBride to kill her husband. The conspirators then decided to re-enact the scenario of lacing William McBride's food with Valium. On April 14, 1980, Judith McBride and Frank Ross carried out their plan. Judith McBride prepared a Valium-laced meal, took it to her husband's apartment that evening, and saw that he ate it. Meanwhile, Ross waited at Judith McBride's home for the call to come over to her husband's apartment. While awaiting Ross' arrival, Judith McBride filled the bathtub, placed an empty Valium bottle on her husband's nightstand, wrote a note to him indicating that she had left, and then let Ross into her husband's apartment. Judith McBride told Ross that she didn't want to be there when the killing took place and she left.

Ross testified that he found McBride asleep in his bed. Ross first hit McBride over the head with a bottle, which only succeeded in arousing McBride from his sleep. Ross then proceeded to hit him several times with the bottle and in the process broke it. When McBride resisted, Ross began attacking McBride with his knife. By then, McBride was on his feet and Ross stabbed McBride in the chest. When McBride continued to resist, Ross pinned McBride against the wall and continued to stab him until McBride's body slid down the wall and sank to the floor. Not content with that, Ross made one final thrust with the knife downwards into McBride's eye. The force was so great that Ross had to put his foot on McBride's head to pull the knife out.

His mission accomplished, Ross carefully straightened the apartment before leaving. He also gathered up incriminating evidence and placed it in a plastic bag. Judith McBride was waiting outside in her car. She offered to drive him back to their house but Ross chose to walk. When Ross arrived back at the house, Judith McBride asked him whether her husband was dead

viction on appeal. *McBride v. State,* Del.Supr., 477 A.2d 174 (1984).

and in the bathtub. Ross answered that he was. Ross then proceeded to boil the murder weapon. He also cut up his boots and coat and took them to a dumpster at a local shopping mall. Several days later, Ross left Dover and returned to his parents' home in Michigan.

Two weeks later, Judith McBride and Frank L. Ross were arrested and charged with the death of McBride's husband. After waiving preliminary hearings, McBride and Ross, in June, 1980, were each indicted for Murder in the First Degree as well as other offenses. In September, 1981, Ross was separately tried before a jury in Superior Court, Kent County, found guilty as charged, and ultimately sentenced to life imprisonment without benefit of parole. In March, 1982, Judith McBride was tried before a jury in Superior Court, Kent County, and she, too, was convicted of First Degree Murder and Conspiracy.

### I

■ The first question presented is whether the Trial Court deprived defendant of his right to an impartial jury in its conduct of *voir dire*. The Court excluded for cause ten of the fifty-eight members of the jury array who affirmatively stated in response to the Court's questioning that they could not return a guilty verdict even if the evidence justified it—if the ultimate sentence would be death. The question posed by the Court was:

> If after you heard a case, the evidence in your opinion justified a verdict of guilty, could you return that verdict knowing that the sentence would be death?

Ross did not object to the *voir dire* question nor did he challenge the excusal of the ten veniremen. Thus, our standard of review is whether the Court's excusal constituted plain or fundamental error.

Defendant contends that the Court, by systematically excluding a class of citizens representing a "distinctive group" of the community, deprived defendant of his right to a representative jury drawn from a fair cross-section of the community, in violation of his Sixth and Fourteenth Amendment rights. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) and *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). Alternatively, defendant contends that the Trial Court was required by 11 *Del.C.* § 3301 to question the jurors further as to their ability to render an impartial verdict and abused its discretion in not doing so. We deal with the arguments in reverse order.

Section 3301 of Title 11 controls the selection of prospective jurors upon *voir dire* in capital cases.[2] The pertinent language of § 3301 is that requiring a juror "called in a capital case [and who has not formed or expressed any opinion in regard to the guilt or innocence of the (defendant) to] be sworn as a juror in the case, *unless* he has conscientious scruples against finding a verdict of guilty in a case where the punishment is death, even if the evidence should so warrant him...." (emphasis added).

Section 3301 has been a part of the statute law of Delaware since 1915, 17 Del. Laws, c. 221 (1915). However, the question of § 3301's compliance with concepts of

---

**2.** 11 *Del.C.* § 3301 provides:

*§ 3301. Examination upon voir dire in capital cases.*

When a juror is called in a capital case, he shall be first sworn or affirmed upon the voir dire and then asked, under the direction of the court, if he has formed or expressed any opinion in regard to the guilt or innocence of the prisoner at the bar. If his answer is in the negative, he shall be sworn as a juror in the case, unless he has conscientious scruples against finding a verdict of guilty in a case where the punishment is death, even if the evi-

dence should so warrant him, or unless he shall be peremptorily challenged, challenged for cause or excused by consent of counsel on both sides. If his answer to the question be in the affirmative, he shall be disqualified to sit in the case, unless he shall say, upon his oath or affirmation, to the satisfaction of the court, that he feels able, notwithstanding such an opinion, to render an impartial verdict upon the law and the evidence, in which event he shall be a competent juror, if not otherwise disqualified, challenged or excused.

due process by excluding from capital cases jurors opposed to the death penalty was first presented in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).[3]

This Court has previously found the above-quoted provisions of 11 *Del.C.* § 3301 to meet the *Witherspoon* test. *Hooks v. State,* Del.Supr., 416 A.2d 189, 194 (1980); *Steigler v. State,* Del.Supr., 277 A.2d 662 (1971), *modified,* 408 U.S. 939, 92 S.Ct. 2872, 33 L.Ed.2d 760 (1972). In *Hooks,* this Court most recently noted that § 3301 "follows very closely the rule laid down in *Witherspoon* ... concerning when a juror should be challenged for cause on the basis of conscientious scruples against capital punishment." 416 A.2d at 194.[4]

■■■ Since § 3301 has been determined to comport with *Witherspoon,* the issue becomes whether the Trial Court properly applied § 3301 in this case so as to comply with *Witherspoon.* We conclude that it

did. Indeed, the question put by the Trial Court to determine juror qualification to serve under § 3301 followed nearly precisely this Court's language in *Hooks.* (See footnote 4 above).[5]

Without disagreeing with *Witherspoon* and *Hooks,* defendant argues that the Trial Court's exclusion of jurors who gave negative responses to the question quoted above violates *Taylor v. Louisiana,* 419 U.S. at 530, 95 S.Ct. at 697, as a selective exclusion of a distinctive group of citizens. *See State v. Boyle,* Del.Gen.Sess., 61 A.2d 121 (1948).[6]

■■■ This argument fails for several reasons. *One, Taylor* is no more relevant to the question presented than is *Boyle.* Neither concerns the exclusion of prospective jurors based on their view on capital punishment. *Taylor* makes no reference to *Witherspoon* nor does it suggest that its ruling has any relevance to the question

**3.** *Witherspoon* struck as unconstitutional an Illinois statute that permitted the prosecution to challenge for cause any juror who stated that, "he has conscientious scruples against capital punishment, or that he is opposed to the same." *Ill.Rev.Stat.,* c. 38, § 743 (1959). The majority of the Court, in a five to four decision, characterized the statute as "arm[ing] the prosecution with unlimited challenges for cause," 391 U.S. at 512, 88 S.Ct. at 1772, of any juror who (in the words of the Illinois Supreme Court) "might hesitate to return a verdict inflicting [death]." *People v. Carpenter,* 13 Ill.2d 470, 150 N.E.2d 100, 103 (1958). *Witherspoon* enunciated the principle that it is a denial of due process to exclude from a jury panel prospective jurors who simply express general objections to or reservations about capital punishment. However, *Witherspoon* reaffirmed the exclusion of jurors for cause if their conscientious or religious scruples against capital punishment would preclude them from rendering a death verdict regardless of the evidence.

**4.** In *Hooks,* a claim similar to the instant one was made "that the systematic exclusion of prospective jurors with conscientious scruples against the imposition of capital punishment led to the seating of an unrepresentative jury...." *Id.* Rejecting the claim, this Court found the Trial Court in *Hooks* to have adhered to the *Witherspoon* standard. In approving the Trial Court's procedure, former Justice Quillen, speaking for this Court, stated:

"[The Trial Court] questioned each juror in such a way as to discover whether his attitude toward capital punishment would prevent him from reaching a verdict on the evidence. Jurors who said they could not return a guilty verdict in any case if they knew the penalty would be death were removed for cause." 416 A.2d at 194–95 (underlining added for emphasis). In *Steigler,* this Court ruled that interpreting § 3301 as only excluding prospective jurors who could not, under any circumstance, render a guilty verdict if the punishment would be death, comported with the *Witherspoon* due process/fair cross-section standard for screening jurors. 277 A.2d at 677.

**5.** There is also no merit to defendant's argument that § 3301 should be construed as requiring a trial court to further interrogate a juror otherwise disqualified under *Witherspoon* to determine whether the juror is nevertheless able to render an impartial verdict. The disqualification of a prospective juror on *Witherspoon* grounds is conclusive.

**6.** In *Boyle,* the Court found the exclusion of women from jury service to be "repugnant to the clear legislative intent" of then-Chapter 45, 10 *Del.C.* and its declaration that "our juries should be ... representative of the cross section of the jurisdiction." 61 A.2d 125.

here presented. *Two, Taylor*'s discussion of the need for a "rational basis" for an exemption had reference to the rationale for the Court's earlier decision in *Hoyt v. Florida,* 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961) (sustaining a provision of Florida law that was very similar to the Louisiana statute in *Taylor* excusing women from jury service who did not opt to serve). *Three, Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) conclusively demonstrate that the exclusion of prospective jurors on the basis of their resolute opposition to capital punishment is (a) a proper application of *Witherspoon;* and (b) in no way contrary to *Taylor v. Louisiana, supra.*[7] In any event, since the jury in this case elected to recommend life imprisonment over death, defendant's argument of a death-prone jury is moot. *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).[8]

## II

Defendant next argues that the Trial Court's failure to record (during the course of the trial) three sidebar conferences deprived defendant of his rights to a complete trial record and effective assistance of substitute counsel on appeal. Alternatively, defendant argues that the Court thereby committed an abuse of discretion constituting reversible error. The State urges rejection of the contentions on the ground that no cognizable prejudice has been established. We agree.

We follow the weight of authority that prejudice must be shown, or perceived, to have resulted from a failure to record a portion of a trial proceeding for reversible error to be found.[9] *Stephens v. Zant,* 5th Cir., 631 F.2d 397 (1980), *rev'd on other grounds,* 459 U.S. 1012, 103 S.Ct. 369, 74 L.Ed.2d 505 (1983); *Edwards v. United States,* 10th Cir., 374 F.2d 24 (1966); *cert. denied,* 389 U.S. 850, 88 S.Ct. 48, 19 L.Ed.2d 120 (1967); *Stirone v. United States,* 3rd Cir., 341 F.2d 253 (1965), *cert. denied,* 381 U.S. 902, 85 S.Ct. 1446, 14 L.Ed.2d 284 (1965); *Sumlin v. State,* 273 Ark. 185, 617 S.W.2d 372 (1981); *Brown v. State,* 242 Ga. 602, 250 S.E.2d 491 (1978).

7. In *Lockett,* four jurors were excluded on the basis of their responses to essentially the same question posed in this case:

> [D]o you feel that you could take an oath to well and truely [sic] try this case ... and follow the law, or is your conviction so strong that you cannot take an oath, knowing that a possibility exists in regard to capital punishment?

The *Lockett* Court noted that the ruling in *Witherspoon* was only applied to set aside the defendant's death sentence and not his conviction of first degree murder. The Court then ruled that the Trial Court had properly excluded for cause prospective jurors whose "attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." 438 U.S. at 596, 98 S.Ct. at 2960 quoting *Witherspoon,* 391 U.S. at 522–23, 88 S.Ct. at 1776–78. Then, addressing *Taylor v. Louisiana,* supra, the Court stated:

> Nothing in *Taylor,* however, suggests that the right to a representative jury includes the right to be tried by jurors who have explicitly indicated an inability to follow the law and instructions of the trial judge.

*Adams v. Texas, supra* also unmistakably supports excluding from jury service any prospective juror "whose beliefs about capital punishment would lead them to ignore the law or violate their oaths." 448 U.S. at 50, 100 S.Ct. at 2529.

8. *Bumper v. North Carolina, supra,* was a companion ruling issued the same year as *Witherspoon. Bumper* reiterates the distinction made in *Witherspoon* between the erroneous exclusion of a prospective juror who harbors doubts about the wisdom of capital punishment from the proper exclusion of a juror who would not render a death verdict regardless of the evidence. Moreover, the Court found *Witherspoon* to be inapplicable in view of the jury's rejection of the death penalty and its recommendation of life imprisonment for the capital offense for which defendant was found guilty. That, of course, is this case.

9. Pursuant to a recent directive from this Court, Superior Court has now adopted the following rule:

> All sidebar conferences and chambers conferences during trial shall be recorded unless the trial judge determines, in advance, that neither evidentiary nor substantive issues are involved.

Super.Ct.Civ.R. 43; Super.Ct.Crim.R. 57.

Applying this rule to the facts of this case, we find no cognizable prejudice to have been established. Stated another way, we find the complained-of omissions did not deprive defendant of meaningful appellate review or of the effective assistance of substitute counsel on appeal. Accordingly, defendant's alternate contentions also fall; that is, that the Court's failure to comply with defendant's recording requests constituted an abuse of discretion; [10] and that the Court's failure to record the given sidebar conferences deprived defendant of the effective assistance of substitute counsel on appeal.

### III

■ Defendant next claims plain error requiring reversal in the Court's jury instruction on Second Degree Murder and in the Court's failure to give any instruction on Manslaughter.[11] The Court's asserted error in its instruction on Second Degree Murder was its failure to define the statutory words "cruel, wicked and depraved indifference to human life" within 11 *Del.C.* § 635.[12] Defendant also claims plain error in the Court's failure to give the jury any instruction on the statutory crime of Manslaughter, 11 *Del.C.* § 632.

The State makes a two-part response: *one,* since there was no evidence to support a finding that the killing was reckless, defendant was not entitled to any instruction on either Murder in the Second Degree or Manslaughter; hence, defendant could not be prejudiced by either an alleged defect in the Court's instruction on Second Degree

Murder or its failure to charge as to Manslaughter. *Two,* the fact that defendant was found guilty of Murder in the First Degree renders harmless any error in instructions on lesser included offenses. We agree.

■ Defendant does not point to any evidence in the record to support a verdict of manslaughter—that is, that the killing was reckless rather than intentional.[13] Ross' own testimony conclusively establishes an intentional killing. On cross-examination, Ross testified:

Q. You went in there with a specific purpose to kill another human being, correct?

A. Yes, I did.

Q. You intended to kill Bill McBride, did you not?

A. Yes, I did.

Q. There is no question in your mind that you were going to kill this individual?

A. No question at all.

Considering all of the evidence of record, a rational trier of fact would have no basis to find defendant guilty of a reckless killing. It necessarily follows that defendant was not entitled to any instruction on either Murder in the Second Degree or Manslaughter. *Derrickson v. State,* Del.Supr., 321 A.2d 497 (1974); *accord Keeble v. United States,* 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973); *United States v. Hinkle,* D.C.Cir., 487 F.2d 1205 (1973); *Thomas v. Anderson,* 6th Cir., 675 F.2d 781 (1982). *See also Hopper v. Evans,* 456

---

**10.** Under 10 *Del.C.* § 525, which directs court reporters to "report all evidence, opinions and other matters as the Superior Court may require," the Superior Court was clearly vested with discretionary authority over such matters prior to this Court's administrative directive referred to in footnote 9.

**11.** Inasmuch as neither of these objections were raised by defendant at trial, defendant must establish these errors to be plain or fundamental requiring reversal in the interest of justice. Supr.Ct.R. 8.

**12.** 11 *Del.C.* § 635 defines Murder in the Second Degree as follows:

A person is guilty of murder in the second degree when:
(1) He recklessly causes the death of another person under circumstances which manifest a cruel, wicked and depraved indifference to human life....

**13.** Manslaughter is defined by 11 *Del.C.* § 632 as follows:

A person is guilty of manslaughter when:
(1) He recklessly causes the death of another person....

U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). *Compare Waters v. State,* Del. Supr., 443 A.2d 500 (1982). There, the jury's failure to convict defendant of Murder in the First Degree rendered pertinent the lesser included offenses of Murder in the Second Degree and Manslaughter and the instructions therein.

■ Aside from the irrelevance of the lesser charges for lack of any supporting evidence, any error in a given charge on the lesser offenses was harmless, at best. While there may be no Delaware case law precisely in point, there is a substantial body of law in other jurisdictions that a finding of guilt to a greater offense renders harmless any error in instructions on lesser included offenses. *State v. Sprague,* Me.Supr., 394 A.2d 253 (1978); *Commonwealth v. Pitts,* 486 Pa. 212, 404 A.2d 1305 (1979); *State v. Huff,* 14 N.J. 240, 102 A.2d 8 (1954). *See also Ruffin v. State,* Del.Supr., 123 A.2d 461 (1956) where this Court applied the general principle that verdicts can render certain jury instructions harmless. In *Ruffin,* this Court held that assumed error in an instruction on First Degree Murder becomes harmless where the defendant is convicted of Second Degree Murder.

## IV

We take up defendant's remaining objections to the jury instructions. The first concerns the Court's jury charge on the statutory defense of extreme emotional distress, 11 *Del.C.* § 641.[14] Defendant does not claim that the Court committed legal error in its instructions on extreme emotional distress. Defendant claims that the Court, by failing to adopt—*in toto*—defendant's proposed instructions on the subject, abused its discretion so as to commit reversible error. We disagree.

■ As previously noted, defendant raised alternate defenses to the charge of First Degree Murder: *one,* that at the time of the killing he was suffering from mental illness or mental defect under 11 *Del.C.* § 401; or *two,* that he was acting under extreme emotional distress. The consequence of a finding that defendant acted under the influence of extreme emotional distress would have been that defendant's intentional killing would have been reduced to the crime of Manslaughter. *See* 11 *Del.C.* § 632(3).[15]

■ A refusal to give a requested instruction is reversible error "only if the instruction: (1) is substantially correct; (2) is not substantially covered by others delivered; and (3) concerns an important point in the trial so that failure to give it seriously impair[s] the defendant's ability to present a given defense." *United States v. Milstead,* 5th Cir., 671 F.2d 950, 952 (1982); *Pine v. United States,* 5th Cir., 135 F.2d 353, 355, *cert. denied,* 320 U.S. 740, 64 S.Ct. 40, 88 L.Ed. 439 (1943). *See also United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975); *Haas v. United Technologies Corp.,* Del.Supr., 450 A.2d 1173 (1982). Applying the test as set out in *Milstead,* the State argues that defendant's proposed instructions were du-

---

**14.** Section 641 provides:

§ *641. Extreme emotional distress.*

The fact that the accused intentionally caused the death of another person under the influence of extreme emotional distress is a mitigating circumstance, reducing the crime of murder in the first degree as defined by § 636 of this title to the crime of manslaughter as defined by § 632 of this title. The fact that the accused acted under the influence of extreme emotional distress must be proved by him by a preponderance of the evidence. The accused must further prove by a preponderance of the evidence that *there is* a reasonable explanation or excuse for the existence of the extreme emotional distress.

The reasonableness of the explanation or excuse shall be determined from the viewpoint of a reasonable person in the accused's situation under the circumstances as he believed them to be.

**15.** Section 632 provides:

§ *632. Manslaughter; class B felony.*

A person is guilty of manslaughter when:

＊　＊　＊　＊　＊　＊

(3) He intentionally causes the death of another person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance; or....

plicitous or potentially misleading. We review the evidence and then the instructions.

The expert testimony at trial on whether defendant acted under extreme emotional distress was conflicting. Two expert witnesses, a psychiatrist and a psychologist, testifying on defendant's behalf, opined that at the time of the killing defendant was under the influence of extreme emotional distress. However, defendant's experts concluded that defendant knew it was wrong to kill; but defendant felt that killing the victim was "the right thing to do." The State's expert witnesses, also a psychologist and a psychiatrist, disagreed with defendant's experts. The State's witnesses did not find defendant to be suffering from any extreme emotional distress at the time of the killing. As the State's experts saw the evidence, defendant "was careful in his planning and even in the execution of the crime and [defendant] showed a presence of mind which does not reflect irresistable impulse." The State's witnesses rejected defendant's claim of being brainwashed. We turn to the instructions.

■ *First,* defendant argues that the omitted portion of his proposed instruction left the jury uninformed that the defense of extreme emotional distress is distinguishable from the defense of mental illness; that is, that the two defenses stand independent and that one may exist without the other. The short answer is that the Court's instructions—read as a whole—plainly informed the jury that the two defenses were separate and distinct. Near the outset of its charge, the Court stated:

* * * As to all of the charges, a defense of mental illness is asserted. This defense will be explained.

As to the charge of murder in the first degree, another defense is asserted in the alternative to the effect that defendant was, at the time, acting under extreme emotional distress so as to reduce the alleged crime to manslaughter.

\* \* \* \* \* \*

If the defendant intentionally caused the death under the influence of extreme emotional distress, such intentional killing amounts not to murder in the first degree but rather to manslaughter.

Later in its charge, the Court addressed the defense of mental illness or mental defect:

The defendant has asserted an affirmative defense in this case that at the time of the conduct charged as a result of mental illness or mental defect the accused lacked substantial capacity to appreciate the wrongfulness of his conduct or lacked sufficient willpower to choose whether he would engage in such conduct or refrain from engaging in it. Therefore, in order to establish the affirmative defense of mental illness or mental defect, it is necessary for the defendant to satisfy you by a preponderance of the evidence of the following propositions. . . .

Since the Court's jury instructions demonstrated that the defense of extreme emotional distress was separate and apart from the defense of mental illness or mental defect, the Court's refusal to give the requested information was clearly not reversible error. *United States v. Milstead, supra.*

*Second,* defendant argues that the jury should have been charged that extreme emotional distress may be evidenced by a "situation affecting defendant for a substantial time, simmering in the unknowing subconscious which inexplicably comes to the fore." Defendant thereby relies on a passage from *People v. Patterson,* N.Y.Ct. App., 39 N.Y.2d 288, 383 N.Y.S.2d 573, 347 N.E.2d 898 (1976), *aff'd, Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), which was quoted with approval by this Court in *Boyd v. State,* Del.Supr., 389 A.2d 1282 (1978):

An action influenced by an extreme emotional disturbance is not one that is necessarily so spontaneously undertaken. Rather, it may be that a significant mental *trauma* has affected a defendant's

mind for a substantial period of time, simmering in the unknowing subconscious and then inexplicably coming to the fore. (underlining added for emphasis)

389 A.2d at 1288. However, defendant has altered the statement in *Patterson* quoted in *Boyd* by substituting "situation" for "a significant mental trauma"; and whereas *Patterson* speaks of such trauma as having affected "a defendant's mind," defendant has altered the descriptive emotional distress to require simply a "situation which has affected" defendant. Moreover, neither the Commentary of the Criminal Code nor *Boyd* recommends that the meaning of "extreme emotional distress" be defined with any particularity.[16]

■ The Court's charge on extreme emotional distress tracked nearly verbatim 11 *Del.C.* § 641. (*See* footnote 14 above). The Court's charge is also consistent with this Court's most recent consideration of the defense of extreme emotional distress in *Moore v. State,* Del.Supr., 456 A.2d 1223 (1983). There we stated:

Implicit within the concept of a reasonable explanation [for the existence of the extreme emotional distress] is the idea that the event which triggers the emotional disturbance must be something external from the accused and cannot have been brought about by the accused's own mental disturbance.

456 A.2d at 1226. Hence, defendant's requested charge was misleading and incorrect.

■ *Finally,* defendant claims reversible error in the Court's failure to include in its charge on extreme emotional distress defendant's proffered statement:

It is not necessary that the Defendant be "reasonable," but rather that his *explanation,* in a situation as he perceived it, was reasonable.

Defendant argues that the reasonableness of killing under extreme emotional distress turns upon the reasonableness of his explanation and not the reasonableness of his conduct. He relies upon a statement from *Boyd, supra,* directing a juror's inquiry to whether "the frenzy of mind [is] based upon a reasonable explanation." *Boyd v. State,* 389 A.2d at 1288.[17] Defendant would have the Court adopt a subjective standard for determining the reasonableness of his explanation. Defendant's proposed charge, if given, would have misled the jury into abandoning an objective inquiry into the cause of alleged extreme emotional distress. To adopt defendant's construction of the defense would render meaningless the concluding sentence of § 641 and this Court's construction thereof in *Moore v. State, supra.* Clearly, the Court did not abuse its discretion in rejecting the proposed instruction.

■ The Court charged that "the reasonableness of defendant's explanation or excuse shall be determined from the viewpoint of a reasonable person in the [defendant's] situation under the circumstances as he believed them to be." In view of the fact that the Court's charge correctly stated the law, nothing further was required. *Miller v. State,* Del.Supr., 224 A.2d 592, 596 (1966); *United States v. Bright,* 5th Cir., 630 F.2d 804, 821–23 (1980); *United States v. Hill,* 5th Cir., 500 F.2d 733, 737–38 (1974), *cert. denied,* 420 U.S. 952, 95 S.Ct. 1336, 43 L.Ed.2d 430 (1975); *United States v. Conversano,* 3rd Cir., 412 F.2d 1143, 1150–51, *cert. denied,* 396 U.S. 905,

16. The Commentary states: "This Code does not include a definition of 'extreme emotional distress,' believing that any definition would curtail the usefulness of the concept, and that it is a term having a commonly accepted meaning which the jury will understand." Commentary on § 641.

17. The reasons defendant articulates on appeal for the giving of the rejected instructions were

not presented to the Trial Court and, hence, arguably come too late, in the absence of a timely specific objection. *United States v. Parisien,* 8th Cir., 574 F.2d 974, *cert. denied,* 439 U.S. 850, 99 S.Ct. 154, 58 L.Ed.2d 154 (1978); *United States v. Phillips,* 8th Cir., 522 F.2d 388 (1975). *See also Young v. State,* Del.Supr., 407 A.2d 517 (1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980).

90 S.Ct. 219, 24 L.Ed.2d 181 (1969). Since we find the Court did not err by foregoing the requested instruction, defendant's related argument that the Court should have provided the jury with written instructions on such omitted matters becomes moot.

## V

Defendant next claims that reversible error was committed in three evidentiary rulings of the Trial Court. We take them up seriatim. The first objection relates to the State's use of the term "insane" or "insanity" in cross-examining the psychiatrist testifying for defendant. Defendant contends that the Trial Court's "approval" of the State's use of the term "insanity" rather than the term "mental illness and/or mental defect" amounted to an abuse of discretion and reversible error. The question as put by the State was:

> Let me ask you this: In your experience here in Delaware, over a number of years and with my personal experience with you, can you tell me pursuant to your examination of Mr. Ross, was he legally insane?

Defendant objected to the use of the term "insanity" on grounds of relevance, noting

that §§ 401 [18] and 402(b) [19] of the Delaware Code make no reference to the term. The Court implicitly overruled defendant's objection by describing § 401 as defining "what is recognized in the law as insanity in Delaware."

On appeal, defendant makes three arguments:

> First, any testimony as to insanity is irrelevant to the affirmative defenses of mental defect or mental condition and is, therefore, inadmissible. D.R.E. § 402.[20] Secondly, even if the testimony were relevant, it is inadmissible in light of the restriction on psychiatric testimony imposed by 11 *Del.C.* § 402(b); D.R.E. § 402. Finally, it was error to seek expert testimony from Dr. Voegele concerning the concept of insanity which was outside his field of expertise.... D.R.E. § 702.[21]

While we note that defendant on appeal has substantially expanded the basis for his objection to the line of questioning, we are not persuaded that any reversible error was committed.

 Our standard of review is whether the trial judge abused his discretion in declining to order the prosecutor to

**18.** 11 *Del.C.* § 401 then provided as follows:

(a) In any prosecution for an offense, it is an affirmative defense that, at the time of the conduct charged, as a result of mental illness or mental defect, the accused lacked substantial capacity to appreciate the wrongfulness of his conduct or lacked sufficient willpower to choose whether he would do the act or refrain from doing it.

(b) If the defendant prevails in establishing the affirmative defense provided in subsection (a) of this section, the trier of facts shall return a verdict of "not guilty by reason of insanity."

**19.** 11 *Del.C.* § 402(b) provides as follows:

(b) A psychiatrist or other expert testifying at trial concerning the mental condition of the accused shall be permitted to make a statement as to the nature of the examination, his diagnosis of the mental condition of the accused at the time of the commission of the offense charged and his opinion as to the extent, if any, to which the capacity of the accused to appreciate the wrongfulness of his conduct or to choose whether he would do the act or refrain from doing it or to have a particular state of mind which is an

element of the offense charged was impaired as a result of mental illness or mental defect at that time. He shall be permitted to make any explanation reasonably serving to clarify his diagnosis and opinion and may be cross-examined as to any matter bearing on his competence or credibility or the validity of his diagnosis or opinion.

**20.** The Delaware Rules of Evidence (D.R.E.), Rule 402 provides:

All relevant evidence is admissible, except as otherwise provided by statute or by these rules or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible.

**21.** D.R.E. 702 provides:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

rephrase his question to delete the word "insanity." A trial judge is vested with wide discretion over the mode of interrogating witnesses; and absent a showing of clear abuse of discretion as well as prejudice, reversal is unwarranted.

▮ From the outset of the trial, counsel for defendant as well as the State had referred to the case as involving "insanity." [22] The focus of the State's cross-examination of defendant's expert was clearly upon defendant's mental status; and the jury was promptly informed that the State's reference to insanity was made within the framework of the controlling statutes §§ 401 and 402. As the record discloses, the witness declined to answer the State's questions phrased in terms of whether defendant was "legally sane" or "legally insane" since they were beyond his competence to answer without the term "insanity" first being defined. And thereafter the State abandoned its line of questioning in favor of questions phrased in terms of the language of § 402(b) (*see* footnote 19). Finally, the jury was properly instructed that insanity only had a meaning within the statutory terms of §§ 401 and 402; and for the jury to find defendant not guilty by reason of insanity, its findings must come within the definition of §§ 401 and 402.

Hence, while it would have been preferable for the prosecution not to frame its questions in terms of sanity or insanity, under the facts of this case, no reversible error resulted; for the risk of confusion was non-existent. Thus, there is no basis for finding reversible error in the line of questioning pursued by the State and permitted by the Court. *See People v. Anderson,* 93 Ill.App.3d 646, 48 Ill.Dec. 931, 417 N.E.2d 663 (1981); *Williams v. State,* 265 Ind. 190, 352 N.E.2d 733 (1976); *People v. Drossart,* 99 Mich.App. 66, 297 N.W.2d 863 (1980).

Defendant next claims reversible error in the Court's exclusion of an incriminating hearsay statement of Robert Kreider offered through a prison inmate for the purpose of exculpating defendant Ross. The inmate was prepared to testify that two months after the killing, Kreider, while incarcerated, told the inmate that Kreider's "specific purpose was to go down to Florida and get a ["turkey" to kill William McBride]." Kreider was unavailable to testify since he had previously invoked his Fifth Amendment privilege against testifying. The Court excluded the inmate's proffered testimony on the ground that it did not come within the exception to the hearsay rule for a statement against interest under D.R.E. 804(b)(3).[23] At trial, Ross' reason for offering the inmate's hearsay statement was to support his claim that he was "inveigled or whatever, recruited" for the McBride killing while Ross was in Florida. It was conceded that Kreider's purported statement was a declaration against his interest which subjected him to criminal liability for conspiracy. However, the

**22.** Defense counsel in his opening statement added:

By the time you have heard all of the evidence you may or may not be thoroughly confused as to what insanity is. The Court is going to instruct you on various rulings about what insanity is or is not. It may or may not help you but you are to follow the Judge's instructions. Ironically the law, the statute that is involved in this case, doesn't actually mention the word "insanity." That is something that everybody is going to be throwing around. I guess the closest thing with that word or a word that I agree that Mr. Liguori uses was bizarre. Bizarre but not unbelievable as to why all of this took place.

**23.** D.R.E. 804(b)(3) states:

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \* \* \* \*

(3) *Statement Against Interest.* A statement which was, at the time of its making, so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Court based its exclusion of the testimony on a requirement of D.R.E. 804(b)(3) of "corroborating circumstances [which] clearly indicate the trustworthiness of the statement." The Court stated, "... there is nothing to corroborate the fact that Kreider went to Florida to recruit somebody [to murder] McBride."

On appeal, defendant makes three arguments for reversal: (1) that the Court misread D.R.E. 804(b)(3) as requiring independent corroborative evidence of the trustworthiness of a statement, whereas the rule only requires "corroborating circumstances"; (2) circumstances under which the inmate's statement was made were sufficient to establish its trustworthiness; and (3) that the testimony was so critical to defendant's case that its exclusion denied defendant his constitutional right to a fair trial. We find no reversible error in the Court's refusal to admit the inmate's statement under D.R.E. 804(b)(3) and no merit to the denial of a fair trial argument.

■ *First,* we are not persuaded that the Court misread D.R.E. 804(b)(3) or abused its discretion in concluding that the trustworthiness of the inmate's statement had not been clearly corroborated. The legislative history of the federal rule counterpart of D.R.E. 804(b)(3)—F.R.E. 804(b)(3) [24]—indicates that the requirement of corroboration requires something more than belief in the trustworthiness of the declarant's own statement. The weight of both federal and state authorities appears to be that hearsay declarations against interest should be admitted only on proof of "circumstances solidly indicating trustworthiness," *United States v. Barrett,* 1st Cir., 539 F.2d 244, 253 (1976), or "by independent evidence that bespeaks reliability," *State v. Higginbotham,* 298 Minn. 1, 212 N.W.2d 881, 883 (1973); *State v. Young,* 89 Wash.2d 613, 574 P.2d 1171, 1179–80

(1978); *State v. DeFreitas,* 179 Conn. 431, 426 A.2d 799, 809 (1980); *but see Harris v. State,* 40 Md.App. 58, 387 A.2d 1152 (1978) (applying rules of evidence not based on the federal rules).

■ *Second,* whether there is sufficient corroborative evidence to admit a hearsay statement against interest is a matter to be committed to the sound discretion of the trial court and reversible only upon a showing of abuse of discretion, *United States v. Beltempo,* 2d Cir., 675 F.2d 472, 480, *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982); *United States v. Guillette,* 2nd Cir., 547 F.2d 743, 754 (1976), or that the ruling was clearly erroneous. *United States v. Bagley,* 5th Cir., 537 F.2d 162 (1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 816, 50 L.Ed.2d 794 (1977); *United States v. Metz,* 5th Cir., 608 F.2d 147, 157 (1979). No such showing has been made.[25] *See State v. Barden,* Me.Supr., 432 A.2d 404 (1981); *People v. Wallach,* 110 Mich.App. 37, 312 N.W.2d 387 (1981).

■ *Third,* the inmate was permitted to testify that Kreider told him that "he [Kreider] was to do this himself but he decided to talk Frank Ross into doing it ... [b]ecause [Ross] was just out of the Navy and he was taught how to kill people." Thus, defendant was able to put before the jury his claim that he had been "inveigled or recruited" to kill McBride. Further, defendant Ross himself testified that while he had met Kreider in Florida on February 4, 1980, Ross had never heard of William McBride until the day he moved into Judith McBride's house on February 28, 1980. Defendant's psychiatrist confirmed that it was the victim's wife "who put into [defendant's] mind how awful her husband was." Thus, defendant's own testimony and that of his witnesses contradicts his

---

**24.** The Commentary to D.R.E. 804(b)(3) "tracks" F.R.E. 804(b)(3), using identical language barring an exculpatory hearsay statement "unless corroborating circumstances clearly indicate the trustworthiness of the statement."

**25.** In fact, defendant readily agreed with the Court's comment that the hearsay statement was "the first time in this case that the thought that Kreider went to Florida to recruit a murderer [had ever come up]."

thesis as to the "critical" importance of the inmate's hearsay statement to defendant's defense.

*Finally,* we find no merit in defendant's claim of constitutional error in the exclusion of the inmate's hearsay testimony. Clearly, defendant was not deprived of the right to present witnesses in his own behalf. *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) is clearly inapposite.

## VI

We take up defendant's remaining claims of prosecutorial misconduct in summation and double jeopardy in sentencing. Defendant lists some ten instances of alleged prosecutorial misconduct which he claims cumulatively deprived him of his right to a fair trial. These include: (1) the prosecutor's gratuitous injection of irrelevant subjects; (2) his statement that defense counsel was asking irrelevant questions "to confuse you" and "to put sawdust in your eyes"; (3) his self-laudatory statements and his characterization of his role as fulfilling "a public trust ... to the people [of] Delaware"; (4) his belittling comments on the value of expert testimony by psychiatrists and psychologists; (5) his characterization of the defense as presenting a "grab-bag" scenario by raising inconsistent defenses of mental illness and extreme emotional distress in hope of a compromise verdict; (6) his reference to defendant's psychiatric expert as tailoring his report to the amount of compensation received; (7) his analogy of defendant's infatuation with death to whether predisposition is a defense to entrapment, a non-issue; (8) his characterization of defendant as a "fool" whose fascination with death resulted in the killing; and (9) his misstatements of the evolution of the Delaware law on extreme emotional distress as a defense and its elements.

The question presented is whether the prosecutor's remarks, if improper, "prejudiced defendant['s] right to a fair trial." *Hooks v. State,* Del.Supr., 416 A.2d 189, 205 (1980). Here, it must be noted that all but one of the statements of the prosecutor (which defendant now contends severely prejudiced his right to a fair trial) were permitted to pass without objection at trial. This Court has oft stated the necessity of timely objection to improper closing argument of opposing counsel, *Hooks v. State, supra* at 203. Failure to make a contemporaneous objection to prejudicial statements generally constitutes a waiver of the right to raise such alleged errors on appeal. *Goddard v. State,* Del. Supr., 382 A.2d 238 (1977). Thus, our standard of review as to all but item (9) is whether the prosecutor's statements amounted to plain or fundamental error so as to "clearly deprive [defendant] of a substantial right, or which clearly show manifest injustice." *Ward v. State,* Del.Supr., 366 A.2d 1194, 1197 (1976); *Hooks v. State, supra* at 204.

We first take up the so-called plain error objections, items (1) through (8). As to those items we cannot conclude, whether they are taken individually or collectively, that defendant's right to a fair trial was substantially prejudiced. This is not to say that all the remarks of the prosecutor were either necessary or appropriate. In our view, the prosecutor did not measure up to standards enunciated by this Court in *Hooks v. State, supra* at 204.[26] However, we are also aware of the difficulty in dealing with murder in a sympathetic or kindly manner.

The State explains away the objected-to statements of the prosecutor as either within the bounds of proper comment or, if improper, not prejudicial to the point of establishing manifest injustice so as to re-

---

26. In *Hooks* the Court stated, "The prosecutor, nevertheless, must remember his unique position within the adversary system. '[I]t is fundamental that his obligation is to protect the inno-cent as well as to convict the guilty, to guard the rights of the accused as well as to enforce the rights of the public.'" [citation omitted] 416 A.2d at 204.

quire a new trial. We agree. In *Hughes v. State*, Del.Supr., 437 A.2d 559 (1981), we stated, "[s]triking the balance between permissible and impermissible comment by a prosecutor, calls for the exercise of a sound discretion by the Trial Judge." 437 A.2d at 571. Here, the Trial Judge was not called upon to exercise his discretion by timely objection to the comments of the prosecutor now complained of. Thus, under our plain error standard of review, we are required to consider at the appellate level whether the several remarks of the prosecutor "prejudicially affect[ed the] substantial rights of the accused." *Sexton v. State*, Del.Supr., 397 A.2d 540, 544 (1979). We find no substantial rights of the accused to have been prejudicially affected by the remarks summarized in (1) through (8) above. Rather than respond to each of the remarks in detail, we adopt generally the State's position that such remarks, individually and collectively, did not constitute reversible error for lack of demonstration of prejudice to defendant.

■ We turn to item (9), alleged misstatements by the prosecutor concerning the history of the law of Delaware on extreme emotional distress and the current state of the law on proof of that affirmative defense. Defendant makes two arguments: *one*, that the prosecutor misrepresented the defense as evolving from the common law defense of provocation; and *two*, that defendant's claim of extreme emotional distress was based on the "nonspontaneous sort." Defendant contends that the prosecutor misled the jury into believing that extreme emotional distress could only exist in the form of a spontaneous reaction resulting in a killing. We find the prosecutor's representations as to the history of the defense and its current requirements of proof to be consistent with the Commentary to § 632 of the Delaware Code.[27] Moreover, counsel for both the State and defendant informed the jury that the Court's instructions on the law would govern; and the Court instructed the jury, following summation and at the outset of its charge, to disregard any statement of the law by counsel that conflicted with the Court's charge on the subject. Thus, any misstatement of the law by counsel was harmless at best, or corrected.

■ Lastly, defendant argues that his sentencing to consecutive terms of life imprisonment without benefit of probation or parole for First Degree Murder and to a term of five years for his weapons offense (Possession of a Deadly Weapon during the

---

**27.** The Commentary to § 632 provides in particular:

Voluntary manslaughter was intentional killing which would be murder except for some mitigating circumstance, usually very loosely called provocation. * * * There was much law on what constitutes provocation. It must be so great as to produce such a frenzy of mind as to make the accused utterly deaf to the voice of reason. Moreover the accused must act at once, without any cooling-off time. The accused must be in a very high state of excitement and must kill as a result thereof, and not because of hatred and ill-will. (footnotes omitted).

\* \* \* \* \* \*

Subsection (3) is a substitute for the old law of "provocation." That term is inadequate to cover all of the situations in which murder might be reduced to manslaughter because of the defendant's emotional frenzy at the time. Fear, as well as anger, might be a mitigation. For a further discussion of the new term, "extreme emotional disturbance," see Commentary on § 641, where it is called "extreme emotional distress." It is anticipated that defendants will normally in this situation be charged with murder and will be permitted to prove in mitigation that they acted under extreme emotional disturbance. (underlining added).

Also pertinent is the Commentary to § 641, which provides in part:

* * * By referring to "extreme mental or emotional disturbance for which there is reasonable explanation or excuse" rather than to provocation, the draft avoids a merely arbitrary limitation on the nature of the antecedent circumstances that may justify a mitigation when the homicidal actor was in great distress.

Secondly, the formulation sweeps away the rigid rules that have developed with respect to the sufficiency of particular types of provocation, such as the rule that words alone can never by enough. Given evidence of extreme mental or emotional disturbance, the question whether it is based on "reasonable explanation or excuse" may be confronted, as we think it should be, in the light of all the circumstances in the case. (underlining added).

Commission of a Felony—Murder) is prohibited by the Delaware Constitution, Article 1 §§ 7, 8. Defendant argues that cumulative or consecutive sentencing for those related offenses constitutes double punishment amounting to double jeopardy in sentencing. Defendant argues that this is the necessary result of an analysis of the two conviction of Murder One and the weapons offense applying the "Blockburger-like rule" enunciated by this Court in *Hunter v. State*, Del.Supr., 420 A.2d 119 (1980). However, the judgment in *"Hunter I"* was vacated by the United States Supreme Court in *Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); and this Court, on remand, concluded that the federal constitutional guarantee against double jeopardy did not prohibit cumulative sentences for the dual conviction of Possession of a Deadly Weapon during the Commission of a Felony and the underlying felony. *Hunter v. State*, 430 A.2d 476 (1981) (*"Hunter II"*). Later, in *Evans v. State*, Del.Supr., 445 A.2d 932 (1982) (*"Evans III"*), this Court explicitly ruled that cumulative punishment for both the weapons offense and the underlying felony did not violate this State's constitutional prohibition against double jeopardy. In *Flamer v. State*, Del. Supr., No. 60, 1980, McNeilly, J. (Feb. 7, 1983), this Court, sitting *en banc*, rejected the argument made here. Hence, the issue is settled under both State and Federal law.

\* \* \*

Affirmed.