Frank ROSS and Robert
Gattis, Petitioners,

v.

**DEPARTMENT OF CORRECTION**
of the State of Delaware, et
al., Respondents.

C.A. No. 96M–03–065 SCD.

Superior Court of Delaware,
New Castle County.

Submitted: Nov. 18, 1997.
Decided: Feb. 27, 1998.

Frank Ross, Robert Gattis, pro se.

Jos. Scott Shannon, Deputy Attorney General, for Respondent Department of Correction et al.

## MEMORANDUM OPINION

DEL PESCO, Judge.

### Introduction

The instant action comes before the Court on remand from an appeal by Petitioners Ross and Gattis to the Supreme Court.[1] The Supreme Court held: (1) that inmates have a clear statutory right to receive individual copies of Department of Correction ("DOC") disciplinary rules under 11 *Del.C.* § 6535; (2) that the Superior Court consider the availability of Petitioners' application for a writ of mandamus as a form of relief; and (3) that further factual development by the Superior Court is required to determine whether or not the petitioners were entitled to copies of certain DOC administrative and operational regulations.[2] Petitioners request that DOC release administrative and operational documents pertaining to inmate disciplinary rules pursuant to 11 *Del.C.* § 6535 and their constitutional right to meaningful access to the courts.

The central issue facing the Court concerns the meaning and scope of the phrase: "The Department shall promulgate rules and regulations for the maintenance of good order and discipline in the facilities and institutions of the Department, . . ."[3] After conducting a hearing and receiving evidence on the matter,[4] the Court finds that the language of § 6535 encompasses standing, ongoing rules and regulations that directly affect and control inmate discipline and conduct. Temporary or contingency orders and other discretionary commands by prison authorities, however, do not fall within the statutory meaning of § 6535, nor do DOC rules and regulations primarily concerned with prison security, administration, operations, personnel, and any other general matters not directly related to inmate discipline and conduct.

### Claims of the Petitioners

Frank Ross is serving a life sentence[5] and

---

1. *Ross v. Board of Corrections*, C.A. No. 96M–03–065, 1996 WL 769271 (Dec. 9, 1996) (ORDER), *rev'd*, Del.Supr., 697 A.2d 377 (1997) (per curiam).

2. *Ross*, 697 A.2d at 378–79.

3. 11 *Del.C.* § 6535. The full text of § 6535 reads:
   The Department shall promulgate rules and regulations for the maintenance of good order and discipline in the facilities and institutions of the Department, including procedures for dealing with violations. A copy of such rules *shall* be provided to each inmate. There shall be a record of charges of infractions by inmates, any punishments imposed and of any medical inspections made.
   *Id.* (emphasis added).

4. The Court convened the hearing on September 10, 1997 at which time extensive testimony and exhibits were received from both Petitioners and

Respondents. The Court also ordered DOC to submit additional documents pertaining to *all* inmate rules and regulations for *in camera* review. The documents actually submitted include: Bureau of Prisons Procedures Nos. 3.9 "Boot Camp Eligibility" (July 29, 1997), and 4.4 "Inmate Grievance Procedure" (two versions) (Apr. 15, 1997), Bureau of Prisons Policy No. 5.4 "In Forma Pauperis" (Sept. 1, 1997), Bureau of Prisons Procedure 8.43 "DNA Testing" (Aug. 1, 1997); also "Inmate Housing Rules for Medium and Maximum Security" at the Delaware Correctional Center (June 14, 1996—maximum security and May 14, 1997—medium security), the "Inmate Reference Manual" (Sept.1992), and the "Delaware Correctional Center Classification Manual" (undated).

5. *See Ross v. State*, Del.Supr., 482 A.2d 727 (1984).

Robert Gattis has been sentenced to death.[6] Both are incarcerated at the Delaware Correctional Center in Smyrna. They claim that DOC is not providing adequate copies of disciplinary rules and regulations to all inmates. They further allege that such copies as are given to the inmates are incomplete, out-of-date, and do not reflect the full range of rules and regulations that affect and control inmate life, the violation of which can result in disciplinary action or the loss of privileges. They ask that DOC be ordered to disclose all rules and regulations, including those contained in prison administrative and operational manuals.[7] Petitioners charge that DOC's failure to provide adequate copies of the disciplinary rules violates 11 *Del.C.* § 6535. They have petitioned the Court for a writ of mandamus ordering DOC to provide complete and up-to-date copies of prison disciplinary rules and/or for a subpoena *duces tecum* to permit the examination of DOC documents bearing upon inmate discipline.

At the hearing, Petitioners and their witnesses[8] testified that they were often in a quandary as to what they could or could not do because they were uncertain what the rules were. This uncertainty was compounded, Petitioners claim, when they approached prison officials who often gave conflicting views of the rules. For example, the Petitioners cited to various housing rules such as the number and types of articles that an inmate may keep in his cell; food service rules regarding the seating arrangements and items that may be taken from the dining hall; and to rules governing inmate movement within housing units, telephone privileges, and housing classification.

Because prison officers were often unavailable to answer such questions, gave conflicting answers, or didn't know the answer, the inmates testified that they tried to look up the pertinent rule or regulation. When Petitioners went to the law library, they claim that the relevant rules were not available or, if they were, they were out of date or incomplete. · They complained that rules for housing and health services, which were not in the law library, were not readily available for inspection or reference elsewhere, and rules for grievance procedures which had been published in the prison newspaper, *The Isthmus,* were available only in limited numbers.[9] If an inmate hadn't been able to pick up a copy of that particular issue or find another inmate who had saved it, it would be difficult to become acquainted with grievance procedures.

When Petitioners wished to review rules that weren't available except by request, they commented that the officers responsible for showing them the rules were less than helpful and made them wait unreasonable periods of time. They complained that they felt intimidated by first having to ask an officer to see the rules and then having to review the material in the immediate presence of the officer. The witnesses repeatedly wondered why comprehensive copies of the rules couldn't be made available in the prison law library or in some other relatively neutral space.

Because some portions of inmate rules have been published, e.g., the grievance procedures, Petitioners questioned why all rules governing inmate activity, including collections such as the Inmate Reference Manual, couldn't likewise be published and distributed to all inmates and updated on some regular basis. Petitioners noted that so many rules are promulgated through memoranda that there wasn't enough space to properly post them where they would be noticed amongst

6. *See Gattis v. State,* Del.Supr., 637 A.2d 808 (1994).

7. In their petition for relief, Ross and Gattis ask for, among other documents, the following: DOC Operational Regulations; DOC Administrative Regulations; The Principal Accountabilities Sections of DOC Job Descriptions Manual; Correctional Medical System [of] Delaware—Health Service's DOC Treatment Protocols and Health Care Manual Guidelines; and The Inmate Reference Manual.

8. Testifying for the Petitioners were inmates Robert Gattis, Frank Ross, Rollin Laub, and William Manchester.

9. *The Isthmus* is published by the "Lifers" association, a group of inmates serving life sentences at the Delaware Correctional Center. The newspaper is paid for out of funds generated by the inmate commissary.

all the other items on display. They further claimed that these memoranda were posted or announced on an ad hoc basis and not within any particular context of the overall rules.

Petitioners' witnesses argued that § 6535 entitles them to receive or review all rules that directly regulate inmate conduct from whatever source. They repeatedly declared that they were not interested in seeing or receiving information related to prison security or materials unrelated to inmate conduct. The petitioners were willing to inspect redacted copies of sensitive documents.

### Claims of DOC

DOC counters that timely and effective notification of all new or modified disciplinary rules occurs through a variety of appropriate channels within the prison system. Notification includes: a 5–page pamphlet of disciplinary rules and other regulations which is provided to inmates upon admission into the system; a copy of the DOC Penal Code of Discipline; posted memoranda and signs; and announcements in the prison newspaper. DOC concedes that years ago, when the rules were much simpler, it used to give each inmate a copy of the complete rules but for administrative reasons no longer follows this policy. DOC asserts that to issue a comprehensive, written copy of all DOC rules and regulations would be impractical and wasteful. DOC contends that to allow inmates to examine general administrative or operational manuals, even when redacted to

protect security matters, would place an undue administrative burden upon DOC and threaten the overall security and safety of prison operations by permitting inmates unnecessary and possibly harmful insights into the inner workings of the correctional system.

At the hearing, senior officials from the DOC [10] testified that disclosure of operational and procedural manuals to the Petitioners would constitute an enormous danger to the safe operation of the correctional system. These manuals contain detailed information about everything from security arrangements, emergency response plans, blueprints of the facilities, and descriptions of plant operations, to personnel structure and administrative protocols. DOC argued that to allow inmates to inspect these materials would be tantamount to handing over the keys of the prison.

With respect to the inmate rules, Commissioner Taylor testified that rules frequently change because of ever-changing conditions which require discretionary action that would be impossible to codify in exact detail. The Commissioner argued that within the meaning of § 6535 there is a difference between an "order," written or oral, given by a prison official and "discipline." In his view, discipline results from the failure to follow an order or a prison policy. The DOC Code of Penal Discipline is a statement of the rules regarding the failure to follow such orders or policy.[11]

10. These officials included: Stanley W. Taylor, Commissioner, Department of Correction; Lt. Lawrence A. McGuigan, Internal Affairs Investigator, Delaware Correctional Center; Ronald G. Hosterman, Treatment Administrator, Delaware Correctional Center; Robert Snyder, Warden, Delaware Correctional Center; Sherese Brewington Carr, Warden, Multi–Purpose Criminal Justice Facility; Thomas Carroll, Warden, Webb Correctional Facility; and Paul Howard, Bureau Chief, Department of Correction.

11. Commissioner Taylor made these points in the course of the following testimony at the September 10, 1997 Hearing:

The Court: ... there is a specific statute that requires that they [inmates] be given a copy of the penal rules. I don't have a copy of them myself here, but you know what I'm talking about.

Witness: Yes.
The Court: Are [there] additional rules and regulations that get promulgated from time to time as issues come up that change the obligations of the inmates?
Witness: Yes.
The Court: And how do inmates know about it?
Witness: They may show up as modifications to the housing rules that are published and left in each housing unit that inmates have access to. They may show up as memoranda on bulletin boards in each housing unit. They may be [as] spontaneous as an officer saying this is the way we're going to do it today for a specific security reason.
The Court: Well, then—
Witness: They will be told. It will be explained to them. But there's a distinction between an order, whether it be verbal or written, and discipline. The distinction that seems to be lost is that there is a deliberate refusal to

Specific regulations that inmates must follow are contained in the Inmate Reference Manual, a copy of which "should be available" in each housing unit. The Commissioner agreed that inmates are entitled to access to these rules and policies, but they must ask to see them. He asserted that if copies of all the rules were given to each inmate, they would inevitably reinterpret the rules in order to confront officers and question their authority to act upon them. Such confrontations would distract officers from their principal mission and impede the smooth operation of the prison. Provision of the rules to each inmate would, moreover, encourage a flood of litigation over the meaning of the rules. The Commissioner noted that there were plenty of procedures through which inmates could vent their grievances and seek redress from any perceived mistreatment without giving them a thick booklet of rules.

Other witnesses for DOC testified that inmates are continuously being informed about particular conditions and rules pertaining to the environment that they live in. These witnesses noted that DOC officers need the discretion to control and direct inmates without the worry of being contradicted by an inmate with a different interpretation of the rules. They observed that copies of the rules given to inmates upon admission into the system are often thrown away, and that, as a practical matter, it is much more effective to issue information as it is needed. They argued that the cost of providing copies of a comprehensive set of rules to each inmate would be prohibitive. It was estimated by more than one DOC witness that there are over 18,000 admissions into the Delaware prison system each year. Finally, Ronald Hosterman, the Treatment Administrator at the Delaware Correctional Center, opined that the provision of a handbook describing every facet of the inmate's life in prison and their responsibilities—what they can or cannot do—is not feasible. Life was too complicated for such detail. He contended that it would be much better to give inmates categories of rules that direct and guide them, but in broad terms only. Mr. Hosterman suggested as an alternative to placing a set of comprehensive rules in the hands of each inmate, it would be more effective to work with the inmates to share and develop the necessary information through *The Isthmus* and other programs that inmates elect to join.

### Adequacy of Petitioners' Request for Writ of Mandamus

■ The Superior Court possesses jurisdiction to issue, upon application, the writ of mandamus to lower tribunals, boards, and agencies, *inter alia*, to compel performance of their official duties.[12] A writ of mandamus, however, may not be sought to create a duty, but only to enforce the performance of a pre-existing duty.[13] Issuance of the writ is within the sound discretion of the Court[14] and will be available upon a showing that the petitioner has a clear right to the perfor-

---

follow, and that's what results in discipline, and that's what seems to be missed here.... The Court: Let me see if I can parse that out. One is if there's an order that's given, it has to be followed, and the failure to follow it would be sanctionable as simply the failure to follow an order.
Witness: That's correct.
The Court: Separate and apart from that, I surmise, is a set of existing rules which are not reviewed on a daily or weekly basis that people are expected to know.
Witness: Right
The Court: And they're expected to conform to those rules without discussion, such as making beds, right.
Witness: That's correct.
The Court: Now, if it's a rule that they're supposed to make their bed every day, is that a written rule somewhere so they know about it?

Witness: That's in the inmate handbook, the reference manual that they referred to, that the disciplinary procedure is a sub-set of.
* * * * *
The Court: Do you believe or have you been advised or is it your understanding that inmate handbooks and housing rules should be made available to inmates?
Witness: Yes.
Hearing Trans. at 151–53, 156 (Sept. 10, 1997).

12. 10 *Del.C.* § 564; *Schagrin Gas Co. v. Evans*, Del.Supr., 418 A.2d 997, 998 (1980).

13. *Capital Educators Ass'n v. Camper*, Del.Ch., 320 A.2d 782, 786 (1974).

14. *Schagrin*, 418 A.2d at 998.

mance of a duty and that there is no other adequate remedy.[15]

■ In the instant case, the language of 11 *Del.C.* § 6535 plainly states: "A copy of such [disciplinary] rules shall be provided to each inmate." Under the clear mandate of the statute, the Petitioners are entitled to written copies of the rules, and DOC is duty bound to produce them. Given their status as inmates and their inability to receive the material as requested through their direct applications to DOC, Ross and Gattis have no adequate alternative than the instant court action to enforce their rights under § 6535.

## The Courts and Prison Administration

■ Courts are reluctant to review and supervise the administration of prisons due to the very nature of prison problems.[16] The administration of correctional facilities is complex, intractable, and not readily susceptible to judicial oversight.[17] So long as the circumstances of a prisoner's confinement is not violative of constitutional or statutory rights, the courts will defer to the sound discretion of the legislative and executive branches in the execution of correctional policies.[18] This is particularly so with regard to security and penological issues which constitute the very foundation of a well-ordered correctional system. Such deference applies to the development of disciplinary rules and to the procedures for dealing with violations and grievances.

## The Meaning and Scope of § 6535

In the exercise of their broad discretional powers, prison officials must not lose sight of the fundamental rights and protections afforded inmates. This principle holds especially true when specific, statutory law has been promulgated to treat prisoners in a specified manner. As determined by the Delaware Supreme Court, the plain meaning of 11 *Del.C.* § 6535 affords inmates the clear legal right to receive copies of DOC disciplinary rules.[19] Still unresolved, however, is the meaning and scope of the statutory language.

■ Section 6535 states: "The Department shall promulgate rules and regulations for the maintenance of good order and discipline in the facilities and institutions of the Department."[20] The words of a statute must be given their ordinary meaning.[21] If the language of a statute is clear and unambiguous, courts may not interpret the statute to mean other than what it says.[22] The dictionary meaning of the term "discipline" encompasses rules and regulations that affect "self-control and orderly conduct" and contribute to "the acceptance of or submission to authority and control."[23] "Order" is defined as "a proper or orderly condition" and something "marked by regularity and discipline."[24] Within the ordinary meaning of these terms, it appears to the Court that rules and regulations promulgated for the maintenance of good order and discipline properly encompass all standing rules, regulations and directives that DOC specifically intends for the control of inmate discipline and conduct. Those rules, regulations, di-

15. *Id.* (citations omitted).

16. *O'Lone v. Estate of Shabazz*, U.S.Supr., 482 U.S. 342, 353, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Block v. Rutherford*, U.S.Supr., 468 U.S. 576, 588, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984).

17. *Turner v. Safley*, U.S.Supr., 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Hewitt v. Helms*, U.S.Supr., 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Bell v. Wolfish*, U.S.Supr., 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

18. *Turner*, 482 U.S. at 84, 107 S.Ct. 2254; *Whitley v. Albers*, U.S.Supr., 475 U.S. 312, 321–22, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Rhodes v. Chapman*, U.S.Supr., 452 U.S. 337, 352, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

19. *Ross v. Department of Correction*, Del.Supr., 697 A.2d 377, 378 (1997).

20. 11 *Del.C.* § 6535.

21. *Sostre v. Swift*, Del.Supr., 603 A.2d 809, 813 (1992).

22. *Id.*; *In re Swanson*, Del.Supr., 623 A.2d 1095, 1096–97 (1993).

23. WEBSTER'S NEW WORLD DICTIONARY 401 (2d ed. 1984).

24. *Id.* at 1000–01.

rectives, and guidelines intended for other purposes within the correctional system are, therefore, not properly included within the purview of § 6535. On this point, the Court agrees with DOC that any inmate intrusion into the operational or administrative concerns of DOC could constitute a threat to general security interests. The potential for disruption of the prison by inmates using this information is obvious. To require DOC to supply such information, moreover, would be a wasteful diversion of DOC resources at a time when the correctional system is already pressed to achieve its central mission. Ross and Gattis' request for a subpoena *duces tecum* to examine these materials is without merit.

■ For purposes of providing a copy of the disciplinary rules, the Court holds that it is the statutory duty of DOC to supply each inmate with a written, comprehensive list of rules by which DOC intends to regulate and control inmate life. The Court finds that the current DOC policy of providing each inmate with only a 5–page information pamphlet upon admission and an 18–page copy of the DOC Penal Code of Discipline does not adequately meet the mandate of § 6535. These two documents do not comprehensively inform inmates of the full range of rules and regulations directly governing them, the violation of which may result in disciplinary action or the loss of privileges. The Court notes that rules not contained in these two publications and which clearly affect inmate conduct and the good order and discipline of the prison are not universally distributed or readily available for inmate inspection.

Housing rules, healthcare regulations, prisoner classification, grievance procedures, and other general prison directives affecting inmate activity that are intended to be ongoing or permanent are typically issued in isolation from each other and may reach the inmate population indirectly or only anecdotally. The documents submitted by DOC for *in camera* inspection disclose a system of piecemeal regulation in which various documents contain regulations that are often duplicative, inconsistent, and out-of-date.

For example, DOC submitted two copies of the Inmate Grievance Procedure. Both are dated April 15, 1997, but one is signed by Bureau Chief and the other is signed by the Warden of Delaware Correctional Center. Although largely the same text, the two versions are subdivided according to different numbering schemes and occasionally vary in wording and detail of procedure.

On page 3 of the Bureau Chief's version, paragraph V.7. states:

> The maximum period between initial grievance receipt and final appeal response shall not exceed 180 calendar days. If a full RGC cannot be convened as scheduled, another hearing shall be rescheduled **within 7 calendar days.** (emphasis added).

On page 5 of the Warden's version, paragraph V.C. states:

> The maximum period between initial grievance receipt and final appeal response shall not exceed 180 calendar days. If a full RGC cannot be convened as scheduled, another hearing shall be rescheduled **as soon as possible.** (emphasis added).

On page 5 of the Bureau Chief's version, the first full paragraph, "Level II (RGC Recommendation/Warden's Decision)," states:

> ... The Grievant will be offered the opportunity to participate in the RGC hearing through **examination of all information presented and discussion with all participants.** The RGC shall ask any question it feels relevant to the issue... (emphasis added).

On page 8 of the Warden's version in paragraph V.G.2.a., "Level II (RGC Recommendation/Warden's Decision)," states:

> ... The Grievant will be offered the opportunity to participate in the hearing through **discussion of any information presented.** The Resident Grievance Committee may ask questions it feels relevant to the issue.... (emphasis added).

Different visitation rules are stated in the Inmate Reference Manual at pages 5–6 and D–1 and in the Inmate Housing Rules for Medium Security Buildings at pages 17–23. For example, the Inmate Reference Manual states at page D–1, paragraph C.4., that

> the number of visitors [an] inmate may receive are **two adults and two children**

**under 12 years of age** at a given time. (emphasis added).

The Inmate Housing Rules for Medium Security states at page 19, paragraph XII.A.7., that

> **Two persons are permitted to visit** at a given time. A person under the age of eighteen (18) may visit when accompanied by an adult. (emphasis added).

The Inmate Reference Manual states at age D–1, paragraph C.1., that

> Medium security inmates and [d]etainees shall be permitted no more than two—45 minute sessions per week. However, **these sessions shall not be scheduled in sequence** (no more than one session on Saturday, Sunday or holidays). (emphasis added).

The Inmate Housing Rules for Medium Security states at page 19, paragraph XII. A.2.b., that

> Time and schedule permitting, **two visits together (time frame of one (1) and a half hours) may be approved together during weekdays** excluding holidays. Otherwise, one (1) forty-five (45) minute visit will be scheduled on Saturday, Sunday and Holidays. (emphasis added).

Likewise, requirements for selection for furloughs are stated differently: the Inmate Reference Manual at page F–1, paragraph II.A .2., states:

> Offense—In considering cases, there is a relationship between certain types of crimes (sex, violence, drugs and alcohol) and time served. The significance of the type of offense becomes less critical as the length of incarceration (timed served) increases.

The Classification Manual at page 51, Section III.C.II.2. & 3., states:

> . . . The following inmates are not eligible for consideration:

> a. Those convicted of a Class A Felony;

> b. Those convicted of a Class B sex offense who have not served ten (10) years;

> c. Those serving mandatory time;

> . . .

> h. Inmates whom the ICC does not wish to consider for any reason.

These are but a few examples of the inconsistencies in the various collections of rules maintained by DOC. Whether the inconsistencies are minor or major in nature, the potential for misunderstanding is the same. It is no wonder that inmates may become confused as to what they should or should not do to remain in compliance with prison policy in circumstances where a unified and comprehensive set of rules and regulations does not exist.

DOC's arguments that the provision of a comprehensive set of rules to each inmate would be too expensive and a wasteful use of DOC resources flies in the face of sound management principles. An open and thorough disclosure of all institutional rules can only facilitate their effective understanding and compliance.[25] Such principles surely apply as much if not more so to prison administration as to any organizational setting in which large numbers of people live and work in highly restricted environments such as one finds in the corporate world, the armed forces, and general governmental administration.[26]

The Court finds that distinction that DOC would draw between "discipline" and "orders" is inconsistent with the plain meaning of § 6535. The statute clearly contemplates a comprehensive scheme of rules and regulations. To suggest that the meaning of "discipline" as it relates to § 6535 be confined to procedures for imposing punishment for the failure to follow the orders and policies of the prison is to ignore the very basis upon which

---

**25.** *See, e.g.,* Wis.Admin.Code. § DOC 303 app. (1997).

**26.** To assist correctional departments, the American Correctional Association has issued a substantial set of standards by which prison officials may develop comprehensive, consistent rules and regulations for the good order of inmate activities. *See* American Correctional Association, Standards For Adult Correctional Institutions Pt. 3 §§ C & E, Pt. 4 §§ A & B (3d ed. 1990). Although not a state requirement, DOC is not currently accredited by the ACA for compliance with its recommended standards for adult prisons. DOC healthcare services, however, are accredited.

discipline is founded: the particularized rules of everyday conduct.

DOC's argument that providing inmates with a comprehensive list of rules regulating inmate activity would create a chaotic atmosphere and result in a flood of frivolous lawsuits is equally flawed. The Court observes that no independent evidence supporting such a proposition was introduced at the hearing.[27] Petitioners sensibly argue that there can be nothing harmful about informing them of all the rules that they must observe while in prison. The Court further notes that many of our sister states in the mid-Atlantic region are required by law to issue exactly such information to their inmates upon admission into the correctional system.[28]

On the purpose for this requirement, the official policy of the Wisconsin Department of Corrections is instructive:

> An important element of fairness is that people must know the rules which they are expected to follow. Rules which are unnecessarily ambiguous or overly broad are unfair, and so are rules which are unwritten and not known by all inmates. If inmates are aware of the rules and what they mean, they are more likely to obey than if they are uncertain about them. When rules are vague, overbroad, or unwritten, the interpretation and enforcement of them may vary greatly from officer to officer. Thus, having specific rules increases fairness and equality of treatment.
>
> Clarity also saves time and money. When there is unnecessary ambiguity, there is also unnecessary disagreement which takes staff time and, ultimately, the time of lawyers and courts. Clarity in the rules can prevent the expenditure of time and money in settling such disagreements.[29]

With regard to which rules DOC includes in every inmate's copy, evidence produced at the hearing discloses two categories: Those rules applying to inmates generally on an institution by institution basis, and those which are specific to special areas. In fact, many rules, regulations, directives, and other orders of DOC are promulgated for the unique circumstances of a particular housing unit, work area, or special location within the prison. Such "local" rules must also be issued to each inmate who lives or uses those areas affected. Because many of these local rules are intended to satisfy disciplinary requirements peculiar to that area, it may make little practical sense to disseminate such information to the general prison population. It may be appropriate for written copies of such localized rules to be given only to the relevant inmate population. Impromptu regulation, emergency orders, and direct commands by prison authorities obvi-

---

**27.** At the hearing, counsel for DOC offered a list of cases—purporting to show that inmate interpretation of prison rules have been routinely rejected by the courts—as proof that a flood of inmate litigation would be the likely result of issuing a comprehensive set of rules. This is a non sequitur. The fact that the courts may reject inmate interpretations of prison rules in no way suggests that the availability of the rules promotes inmate litigation.

**28.** See, e.g. N.J.ADMIN. CODE 10A:4–2.1 et seq. (mandating the issuance of comprehensive inmate rules and regulations upon admission); N.Y. CORRECT. § 138(2) (McKinney 1997) (same); 27 PA. CODE §§ 95.222—95.224 (1996) (same); W.VA.STAT. § 28–5–27(f) (same). The federal correctional system also requires that every prison develop and issue to each inmate on admission a comprehensive list of written rules and regulations. 28 C.F.R. § 541.11 (1997).

Most states issue inmate "handbooks," whether required by law or not, as a matter of sound administrative policy in order to inform the pris-

on population unequivocally of what is and is not expected of them during their incarceration. See, e.g., 15 CAL.C.REG. ch. 1 (1995) (130-page comprehensive set of rules and regulations of inmate conduct); WIS.ADMIN.CODE. § DOC 303 et seq. (1997) (same). See generally AMERICAN CORRECTIONAL ASSOCIATION, supra. upon receipt, inmates are required to sign an affidavit that they have a copy of the rules and understand that they are subject to them. In these jurisdictions, failure to provide an inmate with a copy of the rules may result in the dismissal of disciplinary actions for violation of the rules against the inmate on due process grounds. See, e.g., Smith v. Coughlin, N.Y.Supr.App. Div., 183 A.D.2d 1008, 583 N.Y.S.2d 622 (1992); Davis v. Coughlin, N.Y.Supr.App.Div., 113 A.D.2d 885, 493 N.Y.S.2d 804 (1988). Many states routinely permit inmates direct access to prison administrative and operational regulations, except as they affect security concerns. See, e.g., supra, 15 CAL. C.REG. ch. 1.

**29.** WIS.ADMIN. CODE § DOC 303 app. (1997).

ously do not fall within the purview of § 6535, but DOC should note the possibility of such contingency orders within its general rules.

DOC may, of course, change the rules at its discretion, and all inmates must be duly informed of such changes. As a matter of fairness and due process, the Court notes that updated copies of the general and local disciplinary rules should be re-issued on an annual basis or at more frequent intervals, as necessary, to ensure that the appropriate information is fully disseminated to the inmate population. Current copies of the general and local disciplinary rules must also be available for inspection in the inmate law library.

### Reasonable Access to the Courts

Ross and Gattis argue that denial of access to administrative and operational regulations constitutes a denial of their constitutional right to meaningful access to the courts.[30] They greatly overstate their position. The Court has found no evidence that Ross or Gattis were somehow denied meaningful access to the courts simply because DOC would not provide the requested administrative or operational regulations. Their right to a copy of the disciplinary rules is vindicated upon DOC's provision of a copy of the rules.

■ The source, form and content of the copy provided to inmates, moreover, is a matter for DOC to determine. As Ross and Gattis cannot point to any specific harm suffered as a result of DOC's denial of materials from administrative or operational regulations, they fail to allege an injury upon which they may predicate a claim that they have been denied meaningful access to the courts. Their claim that they have been denied meaningful access to the courts is accordingly dismissed pursuant to Superior Court Civil Rule 12(b)(6) for failure to state a claim upon which relief may be granted.[31]

### Conclusion

For the above stated reasons, a writ of mandamus shall issue, directing that the Department of Correction comply with its statutory duty to provide the Petitioners and all inmates under DOC supervision with comprehensive, written copies of the disciplinary rules. The content of the copy provided shall be determined by DOC in accordance with the guidelines discussed above. Comprehensive and up-to-date copies of the disciplinary rules shall be provided by DOC to all inmates as soon as it is reasonably practical to assemble and distribute them. Within 60 days from the date of this decision, DOC shall provide the Court with its plan for compliance with this Order, and DOC shall provide the Court with a copy of the new comprehensive rules upon completion. Petitioners' request for a subpoena *duces tecum* is DENIED. Petitioners' claim that they have been denied meaningful access to the courts by DOC's refusal to avail them of materials from DOC administrative and operational regulations is hereby DISMISSED for failure to state a claim.

IT IS SO ORDERED.

### ORDER

For the reasons set forth in this Court's Memorandum Opinion of February 27, 1998, a writ of mandamus shall issue, directing that the Department of Correction ("DOC") comply with its statutory duty to provide the Petitioners and all inmates under DOC supervision with comprehensive, written copies of the disciplinary rules. The content of the copy provided shall be determined by DOC in accordance with the guidelines discussed in the Memorandum Opinion. Comprehensive and up-to-date copies of the disciplinary rules shall be provided by DOC to all inmates as soon as it is reasonably practical to assemble and distribute them. Within 60 days from the date of this decision, DOC shall provide the Court with its plan for

**30.** *See Johnson v. State,* Del.Supr., 442 A.2d 1362 (1982); *Bounds v. Smith,* U.S.Supr., 430 U.S. 817, 97 S.Ct. 1491 (1977).

**31.** *Nicholson v. Snyder,* Del.Supr., 616 A.2d 1214 (1992); *Spence v. Funk,* Del.Supr., 396 A.2d 967 (1978) (In order to dismiss a complaint under Superior Court Civil Rule 12(b)(6), the Superior Court must determine that there is no reasonably conceivable set of circumstances subject to proof which the plaintiff could recover).